Nos. 07-1968-cr (L)
*United States v. Sabir*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: February 17, 2009     Decided: February 4, 2011)

Docket Nos. 07-1968-cr (L), 07-5531-cr (CON)

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

ABDULRAHMAN FARHANE, also known as "Abderr Farhan," and RAFIQ SABIR,

*Defendants-Appellants*.

Before:

WINTER, RAGGI, *Circuit Judges*, and DEARIE, *Chief District Judge*.[1]

In this appeal from a judgment of conviction entered after a jury trial in the United States District Court for the Southern District of New York (Loretta A. Preska, *Chief Judge*), defendant Rafiq Sabir contends that (1) 18 U.S.C. § 2339B, under which he was convicted for providing and conspiring to provide material support to a terrorist organization, is

---

[1] Chief District Judge Raymond J. Dearie of the Eastern District of New York, sitting by designation.

unconstitutionally vague and overbroad; (2) the trial evidence was insufficient to support his conviction; (3) the government's use of peremptory juror challenges exhibited racial bias in violation of the Fourteenth Amendment; (4) erroneous evidentiary rulings violated his rights to confrontation and/or a fair trial; (5) the district court abused its discretion in addressing alleged juror misconduct; and (6) the government's rebuttal summation deprived him of a fair trial. We reject these arguments as without merit.

AFFIRMED.

Judge Raggi concurs in part in a separate opinion.

Judge Dearie dissents in part in a separate opinion.

————————

EDWARD D. WILFORD (Natali J.H. Todd, *on the brief*), New York, New York, *for Defendant-Appellant*.

JENNIFER G. RODGERS, Assistant United States Attorney (Karl Metzner, Assistant United States Attorney, *on the brief*), *on behalf of* Michael J. Garcia, United States Attorney for the Southern District of New York, New York, New York, *for Appellee*.

————————

REENA RAGGI, *Circuit Judge*:

**I.** **Background** ................................................................................................... **[5]**
    A. 2001: The Initial FBI Investigation into Co-Defendant Tarik Shah ................................................................................ **[5]**

    B. 2004: Shah Offers to Support al Qaeda ................................... **[6]**

    C. 2005: Shah and Sabir Swear Allegiance to al Qaeda and Attempt To Provide Material Support ........................................... **[7]**

    D. Prosecution and Conviction .................................................... **[8]**

2

**II.** **Discussion** ......................................................................................... **[10]**

A. 18 U.S.C. § 2339B Is Not Unconstitutionally Vague as
Applied to Sabir's Case .......................................................... **[10]**

   1. The Statutory Framework ................................................ **[10]**

   2. Sabir's Vagueness Claim ................................................. **[13]**

      a. Sabir Fails to Demonstrate Facial Vagueness
         or Overbreadth .................................................. **[13]**

      b. Sabir Fails To Demonstrate that § 2339B Is
         Unconstitutionally Vague as Applied to his
         Case ................................................................... **[17]**

         (1) Sabir's Vagueness Claim Is Properly
            Reviewed as Applied ............................... **[17]**

         (2) The Standards for As-Applied Review ..... **[19]**

         (3) Sabir's Vagueness Challenge to the
            Statutory Proscriptions Fails .................... **[20]**

         (4) The "Medicine" Exception Does Not Render
            § 2339B Unconstitutionally Vague as Applied
            to Sabir ................................................... **[25]**

B. The Trial Evidence Was Sufficient To Support Sabir's Conviction ......... **[29]**

   1. Count One: Conspiracy .................................................. **[29]**

   2. Count Two: Attempt ....................................................... **[31]**

      a. Intent .................................................................. **[31]**

      b. Substantial Step ................................................. **[34]**

         (1) The "Substantial Step" Requirement Expands
            Attempt Beyond the Common Law .......... **[34]**

         (2) Identifying a Substantial Step by Reference
            to the Crime Being Attempted ................. **[35]**

         (3) The Evidence Manifests a Substantial Step
            Towards the Provision of Material Support
            in the Form of Personnel .......................... **[38]**

         (4) The Dissent's Mistaken View of the
            Substantial Step Requirement ................... **[40]**

            (a) Sabir Did More Than Express a
               Radical Idea When He Produced
               Himself as a Doctor Sworn To Work
               Under the Direction of al Qaeda .................... **[40]**

            (b) The Provision of Personnel and the
               Subsequent Provision of Expert Services

by Such Personnel Are Distinct Forms
of Material Support ........................................ **[42]**
(c)  Upholding Sabir's Attempt Conviction
Raises No Double Jeopardy Concerns .......... **[47]**
(d)  No Government Conduct Precluded
a Jury Finding of a Substantial Step .............. **[49]**

C.    The District Court Reasonably Rejected Sabir's *Batson* Challenge ......... **[50]**
    1.  Prospective Juror #5 ...................................................... **[53]**
    2.  Prospective Juror #26 ..................................................... **[54]**
    3.  Prospective Juror #27 ..................................................... **[56]**

D.    Sabir's Evidentiary Challenges Are Uniformly Without Merit ................ **[57]**
    1.  Expert Witness Testimony .............................................. **[58]**
      a.  Kohlmann's Testimony Satisfied the Enumerated
        Requirements of Rule 702 ..................................... **[59]**
      b.  Kohlmann's Testimony Was Helpful to the Jury .............. **[60]**
      c.  Kohlmann's Testimony Was Relevant ............................... **[61]**
      d.  Kohlmann's Testimony Did Not Reach Beyond
        the Government's Rule 16 Proffer ....................... **[62]**
    2.  Co-Conspirator Statements ............................................ **[63]**
      a.  Shah's Recorded Conversations with the Informant
        and the Undercover Were Admissible Under
        Fed. R. Evid. 801(d)(2)(E) ...................................... **[63]**
      b.  The Admission of Shah's Statements Did Not
        Violate Sabir's Right to Confrontation ............................... **[67]**
    3.  Prior Inconsistent Statement ......................................... **[67]**
    4.  State-of-Mind Evidence .................................................. **[69]**
    5.  Rule 403 Objections ....................................................... **[71]**
      a.  The Shareef Materials ........................................... **[71]**
      b.  The Poughkeepsie Mosque Incident ................................ **[72]**
      c.  *Mujahideen* Activities in Bosnia ....................................... **[73]**

E.    Summation Issues ................................................................ **[73]**

F.    Juror Misconduct ................................................................ **[78]**

**III.**    **Conclusion** ........................................................................ **[83]**

Defendant Rafiq Sabir, whose birth name is Rene Wright, is a United States citizen

and licensed physician who, in May 2005, swore an oath of allegiance to al Qaeda and promised to be on call to treat wounded members of that terrorist organization in Saudi Arabia. Convicted after a jury trial in the United States District Court for the Southern District of New York (Loretta A. Preska, *Chief Judge*) of conspiring to provide and actually providing or attempting to provide material support to a terrorist organization in violation of 18 U.S.C. § 2339B, and sentenced to a 300-month term of incarceration, Sabir now challenges his conviction on various grounds. Specifically, he contends that (1) § 2339B is unconstitutionally vague and overbroad, (2) the trial evidence was insufficient to support his conviction, (3) the prosecution's peremptory jury challenges exhibited racial bias, (4) evidentiary rulings deprived him of the right of confrontation and/or a fair trial, (5) the district court abused its discretion in addressing alleged juror misconduct, and (6) the prosecution's rebuttal summation deprived him of a fair trial. For the reasons explained in this opinion, we conclude that these arguments lack merit. Accordingly, we affirm Sabir's judgment of conviction.[2]

## I.    **Background**

### A.    2001: The Initial FBI Investigation into Co-Defendant Tarik Shah

Defendant Rafiq Sabir is a New York licensed physician, trained at Columbia University, who specializes in emergency medicine. In 2001, the Federal Bureau of Investigation began investigating Sabir's longtime friend Tarik Shah for the possible transfer

---

[2] In a separate order issued today, we dismiss the appeal of Sabir's co-defendant Abdulrahman Farhane.

of money to insurgents in Afghanistan. As part of that investigation, an FBI confidential informant known as "Saeed" cultivated a relationship with Shah, in the course of which Shah was recorded speaking openly about his commitment to jihad (holy war) in order to establish Sharia (Islamic law) and about his wish to provide "deadly and dangerous" martial arts training to mujahideen (jihad warriors). Gov't Exh. ("GX") 802T at 1-2; GX 803T at 2-4; GX 804T at 3; Trial Tr. at 590-91, 601-03.[3] During these conversations, Shah repeatedly identified Sabir as his "partner." GX 801T at 1; GX 807T at 3; see Trial Tr. at 903-04.

B.      2004: Shah Offers to Support al Qaeda

On March 3, 2004, Saeed and Shah traveled to Plattsburgh, New York, where Saeed introduced Shah to Ali Soufan, an undercover FBI agent posing as a recruiter for al Qaeda.[4] In a series of recorded meetings with Agent Soufan, Shah detailed his martial arts expertise

---

[3] Trial evidence indicated that beginning in the mid-1990s, Shah in fact taught martial arts classes at numerous locations, including two mosques in suburban Maryland and another two in upstate New York, as well as at his own martial arts school in New York City. Participants in these classes testified that Shah taught them the use of deadly weapons and lethal fighting techniques, while exhorting them to embrace jihad.

[4] Al Qaeda is the most notorious terrorist group presently pursuing jihad against the United States. In February 1998, its leaders, including Osama bin Laden and Ayman al Zawahiri, issued an infamous fatwa (religious decree) pronouncing it the individual duty of every Muslim to kill Americans and their allies – whether civilian or military – in any country where that could be done. For a detailed discussion of this fatwa and al Qaeda's terrorist activities up to 2004 – including the 1998 bombings of American embassies in Kenya and Tanzania, which killed 224 people; the October 2000 bombing of the USS Cole, which took 17 lives; and the September 11, 2001 airplane attacks on the World Trade Center and the Pentagon, which killed 2,973 persons – see The National Commission on Terrorist Attacks Upon the United States, The 9/11 Commission Report (2004). See also United States v. Moussaoui, 591 F.3d 263, 273-74 (4th Cir. 2010); In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 103-05 (2d Cir. 2008).

and offered to travel abroad to train al Qaeda combatants. Shah also told Soufan about Sabir, "an emergency room doctor" who had been his "trusted friend[]" for more than 25 years. GX 902T at 2, 7. Explaining that he knew Sabir's "heart," Shah proposed that the two men join al Qaeda as "a pair, me and a doctor." Id. at 3, 23. At a subsequent meeting with Saeed, Shah reported that he had spoken in person with Sabir about this plan.

Shah and Agent Soufan next met in Orlando, Florida, in April 2004, at which time Shah agreed to prepare a syllabus for a martial arts training course as well as a training video. Shah also questioned Soufan at this meeting about al Qaeda suicide bombings and asked whether he could receive, as well as provide, terrorist training.

C.    2005: Shah and Sabir Swear Allegiance to al Qaeda and Attempt To Provide Material Support

For most of the time between May 2004 and May 2005, Sabir was out of the United States, working at a Saudi military hospital in Riyadh. On May 20, 2005, during a visit to New York, Sabir met with Saeed and Agent Soufan at Shah's Bronx apartment. Sabir told Soufan that he would soon be returning to Riyadh. He expressed interest in meeting with mujahideen operating in Saudi Arabia and agreed to provide medical assistance to any who were wounded. See GX 906T at 15, 87. He suggested that he was ideally situated to provide such assistance because he would have a car in Riyadh and "carte blanche" to move freely about the city. Id. at 67.

To ensure that Shah and Sabir were, in fact, knowingly proffering support for terrorism, Soufan stated that the purpose of "our war, . . . our jihad" is to "[e]xpel the infidels

7

from the Arabian peninsula," id. at 22, and he repeatedly identified "Sheikh Osama" (in context a clear reference to Osama bin Laden) as the leader of that effort, see, e.g., id. at 31, 34, 59, 87, 98-99. Shah quickly agreed to the need for war to "[e]xpel the Jews and the Christians from the Arabian Peninsula," id. at 22, while Sabir observed that those fighting such a war were "striving in the way of Allah" and "most deserving" of his help, id. at 66.

To permit mujahideen needing medical assistance to contact him in Riyadh, Sabir provided Soufan with his personal and work telephone numbers. See id. at 40, 83. When Shah and Soufan noted that writing down this contact information might create a security risk, Sabir encoded the numbers using a code provided by Soufan. See id. at 49-53.

Sabir and Shah then participated in bayat, a ritual in which each swore an oath of allegiance to al Qaeda, promising to serve as a "soldier of Islam" and to protect "brothers on the path of Jihad" and "the path of al Qaeda." Id. at 106-08, 114-16. The men further swore obedience to "the guardians of the pledge," whom Soufan expressly identified as "Sheikh Osama," i.e., Osama bin Laden, and his second in command, "Doctor Ayman Zawahiri." Id. at 98, 108-10, 115.

D.    Prosecution and Conviction

Shah and Sabir were arrested on May 28, 2005, and thereafter indicted in the Southern District of New York on charges that between October 2003 and May 2005, they (1) conspired to provide material support or resources to the terrorist organization al Qaeda, see 18 U.S.C. § 2339B; and (2) provided or attempted to provide such support, see id. §§ 2339B, 2. See Indictment ¶¶ 1-2, United States v. Shah, S4 05 Cr. 673 (LAP) (S.D.N.Y. filed June

8

27, 2005).[5] The two counts used identical language to describe three types of material support that defendants provided, attempted to provide, or conspired to provide:

> (i) one or more individuals (including themselves) to work under al Qaeda's direction and control and to organize, manage, supervise, and otherwise direct the operation of al Qaeda, (ii) instruction and teaching designed to impart a special skill to further the illegal objectives of al Qaeda, and (iii) advice and assistance derived from scientific, technical and other specialized knowledge to further the illegal objectives of al Qaeda.

Id. ¶¶ 1-2. The two counts further alleged that Shah would provide "martial arts training and instruction for jihadists," while Sabir would provide "medical support to wounded jihadists," both defendants "knowing that al Qaeda had engaged and engages in terrorist activity" and "terrorism." Id.

After Shah pleaded guilty on April 4, 2007, to Count One of the indictment, trial against Sabir commenced on April 24. On May 21, 2007, the jury found Sabir guilty on both the conspiratorial and substantive charges against him, and, on November 28, 2007, the district court sentenced him principally to 300 months' incarceration. This appeal followed.

## II.    Discussion

A.    18 U.S.C. § 2339B Is Not Unconstitutionally Vague as Applied to Sabir's Case

In raising a constitutional challenge to his conviction, Sabir relies on the same argument he urged in the district court in unsuccessfully seeking dismissal of his indictment:

---

[5] Shah and Sabir were not named in Counts Three and Four of the indictment, charging Mahmud Faruq Brent with conspiring to provide and providing material support in the form of personnel to the terrorist organization Lashkar-e-Taiba. See Indictment ¶¶ 3-4. We do not discuss these charges further in this opinion.

9

that 18 U.S.C. § 2339B is void for vagueness and overbroad in defining the conduct proscribed. See United States v. Shah, 474 F. Supp. 2d 492, 496-500 (S.D.N.Y. 2007). Upon de novo review, see Arriaga v. Mukasey, 521 F.3d 219, 222 (2d Cir. 2008), we conclude that the argument is without merit as § 2339B presents no overbreadth concerns and is not unconstitutionally vague as applied to Sabir's conduct.

### 1.    The Statutory Framework

Preliminary to explaining our reasons for rejecting Sabir's vagueness challenge, we review the relevant statutory framework. Title 18 U.S.C. § 2339B(a)(1) imposes criminal liability on anyone who "knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so."[6] The statute expressly conditions liability on a person having knowledge that the relevant organization is a "designated terrorist organization" or "has engaged or engages in terrorist activity" or "terrorism" consistent with various specified provisions of law. 18 U.S.C. § 2339B(a)(1); see Holder v.

---

[6] Section 2339B, entitled "Providing material support or resources to designated foreign terrorist organizations" was enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, § 303(a), 110 Stat. 1214, 1250 (1996), to supplement 18 U.S.C. § 2339A, entitled "Providing material support to terrorists," which was enacted two years earlier as part of the Violent Crime Control and Law Enforcement Act, Pub. L. No. 103-322, § 12005(a), 108 Stat. 1796, 2022 (1994). These statutory provisions have been substantively amended twice: first, in response to al Qaeda's September 11, 2001 attacks on the United States, by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("USA PATRIOT Act"), Pub. L. No. 107-56, § 810(d), 115 Stat. 272, 380 (2001); and second, by the Intelligence Reform and Terrorism Prevention Act ("IRTPA"), Pub. L. No. 108-458, § 6603(c), 118 Stat. 3638, 3762-63 (2004). As Sabir stands convicted under the latest iteration of the statute, we cite thereto in this opinion.

10

Humanitarian Law Project, 130 S. Ct. 2705, 2709 (2010) (holding that "knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities," is mental state required to prove violation of § 2339B).[7]

In identifying the "material support or resources" whose provision to a designated terrorist organization is proscribed, § 2339B references the definition of that term "in section 2339A (including the definitions of 'training' and 'expert advice or assistance' in that section)." Id. § 2339B(g)(4). Section 2339A states, in pertinent part:

> (1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment,

---

[7] Al Qaeda's designation as a terrorist organization pursuant to Section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189, is undisputed. See 64 Fed. Reg. 55,112 (1999); 66 Fed. Reg. 51,088 (2001); 68 Fed. Reg. 56,860 (2003). The United States' response to al Qaeda has not, however, been limited to such designation. Two successive administrations have indicated that the nation is at "war" with al Qaeda. See Press Release of Remarks by President Obama on Strengthening Intelligence and Aviation Security, Jan. 7, 2010 ("We are at war. We are at war against al Qaeda, a far-reaching network of violence and hatred that attacked us on 9/11, that killed nearly 3,000 innocent people, and that is plotting to strike us again. And we will do whatever it takes to defeat them."); Eric Lichtblau, Bush Seeks to Affirm a Continuing War on Terror, N.Y. Times, Aug. 30, 2008, at A10 (quoting administration proposal that Congress "acknowledge again and explicitly that this nation remains engaged in an armed conflict with Al Qaeda . . . and associated organizations, who have already proclaimed themselves at war with us and who are dedicated to the slaughter of Americans"). The executive locates support for its actions in Congress's September 18, 2001 Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001). See, e.g., Harold Hongju Koh, Legal Adviser, U.S. Department of State, Address to the Annual Meeting of the American Society of International Law: The Obama Administration and International Law (Mar. 25, 2010), available at http://www.state.gov/s/l/releases/remarks/139119.htm (explaining that in light of al Qaeda's "horrific" attacks on the United States, the United States is "in an armed conflict with al Qaeda" that is justified by both international and domestic law).

facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

(2) the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

(3) the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

Id. § 2339A(b).[8]

With respect to the provision of "personnel," § 2339B limits liability to persons who have "knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization." Id. § 2339B(h). The statute states that "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." Id.; see Holder v. Humanitarian Law Project, 130 S. Ct. at 2728 (emphasizing that statute "avoid[s] any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups").

### 2. Sabir's Vagueness Claim

---

[8] Title 18 U.S.C. § 2339B(i), added by IRTPA, precludes any construction or application of § 2339B that abridges the exercise of First Amendment rights. This necessarily extends to those parts of § 2339A incorporated into § 2339B, such as these definitions.

12

For a conviction to comport with the constitutional mandate of due process, see U.S. Const. amend. V, the penal statute at issue must define the criminal offense (1) "with sufficient definiteness that ordinary people can understand what conduct is prohibited" and (2) "in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983); accord Holder v. Humanitarian Law Project, 130 S. Ct. at 2718; United States v. Rybicki, 354 F.3d 124, 129 (2d Cir. 2003) (en banc). Sabir argues that his conviction violates both prongs of this void-for-vagueness doctrine because § 2339B's prohibitions against providing "personnel," "training," and "expert advice and assistance" to terrorist organizations are overbroad and afford insufficient notice to persons who may traduce those prohibitions and inadequate standards for authorities who must enforce them. He contends further that the statutory exception for "medicine" is too vague to have put him on notice that it did not encompass his consultative services as a physician.

a.      Sabir Fails to Demonstrate Facial Vagueness or Overbreadth

Sabir contends that § 2339B is unconstitutionally vague both on its face and as applied to his case. In support of his facial challenge, Sabir relies primarily on the overbreadth doctrine. This confuses the issue. As the Supreme Court recently observed, vagueness and overbreadth are distinct concerns, the first implicating the Due Process Clause and the latter the First Amendment. See Holder v. Humanitarian Law Project, 130 S. Ct. at 2719. A statute whose application is clear is not rendered unconstitutionally vague because it proscribes expression protected by the First Amendment. Id. In any event, Sabir fails to

13

state an overbreadth claim.

A law is unconstitutionally overbroad if it "punishes a substantial amount of protected free speech, judged in relation to [its] plainly legitimate sweep." Virginia v. Hicks, 539 U.S. 113, 118-19 (2003) (internal quotation marks omitted). A finding of overbreadth invalidates all enforcement of a challenged law, unless it can be saved by a limiting construction. Id. at 119. Mindful that such relief is "strong medicine," the law rigorously enforces the burden on the challenging party to demonstrate "substantial" infringement of speech. United States v. Williams, 553 U.S. 285, 292 (2008) (emphasis in original). Sabir's recitation of the applicable legal standards and his conclusory declaration that § 2339B is overbroad do not come close to carrying this burden.

As the Supreme Court stated in rejecting a First Amendment challenge to § 2339B, the statute leaves persons free to "say anything they wish on any topic," including terrorism. Holder v. Humanitarian Law Project, 130 S. Ct. at 2722-23. It does not prohibit independent advocacy of any kind. See id. at 2723, 2728. It does not prohibit or punish mere membership in or association with terrorist organizations. See id. at 2723, 2730. Thus, it does not seek

> to suppress ideas or opinions in the form of 'pure political speech.' Rather, [it] prohibit[s] 'material support,' which most often does not take the form of speech at all. And when it does, the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations.

Id. at 2723. Such circumstances do not evidence overbreadth.

To the extent Sabir asserts that § 2339B is overbroad in limiting "a doctor's right to

14

practice medicine," Appellant's Br. at 14-15, he cites no authority locating such a right within the Constitution, much less in the First Amendment. The Supreme Court has long held that "there is no right to practice medicine which is not subordinate to the police power of the states . . . and also to the power of Congress to make laws necessary and proper" to the exercise of its constitutional authority. Lambert v. Yellowley, 272 U.S. 581, 596 (1926) (Brandeis, J.) (rejecting physician's claim that, despite powers conferred on Congress by Eighteenth Amendment, he held constitutional right to prescribe such medicines as he deemed best to effect patient's cure); see also Conn v. Gabbert, 526 U.S. 286, 291-92 (1999) (observing that there is no due process right to practice one's profession free of any restraints and that due process is violated only by "complete prohibition of the right to engage in a calling"); Dent v. West Virginia, 129 U.S. 114, 122 (1889) ("[T]here is no arbitrary deprivation of [the right to practice medicine] where its exercise is not permitted because of a failure to comply with conditions imposed by the state for the protection of society."). With particular reference to the First Amendment, a plurality of the Court in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833 (1992), rejected a First Amendment challenge to a state law requiring physicians to provide patients with specific information about certain medical risks, observing that "[t]o be sure, the physicians' First Amendment rights not to speak are implicated, . . . but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State," id. at 884 (plurality opinion). Because Sabir thus cannot claim a "right" to provide medical treatment for terrorists that is not "subordinate to . . . the power of Congress to make laws necessary and

15

proper" to the nation's defense, <u>Lambert v. Yellowley</u>, 272 U.S. at 596; <u>see</u> U.S. Const. art. I, § 8, he cannot mount a claim that § 2339B is unconstitutionally overbroad.

Nor can Sabir demonstrate overbreadth by faulting § 2339B for not requiring proof of his "specific intent to further . . . terrorist activities." Appellant's Br. at 24; <u>see</u> <u>Holder v. Humanitarian Law Project</u>, 130 S. Ct. at 2718 (construing § 2339B not to require proof of such intent). The argument is grounded not in the First Amendment but in the Fifth, specifically, in the due process requirement that any conviction be supported by evidence of <u>personal</u> guilt. <u>See</u> <u>Scales v. United States</u>, 367 U.S. 203, 224-25 (1961). Such a due process concern can arise when criminal liability is premised on mere membership in an organization. <u>See</u> <u>id.</u> at 205-06, 224-28 (rejecting Fifth Amendment challenge to Smith Act, 18 U.S.C. § 2385 (prohibiting membership in organization advocating overthrow of United States government by force or violence), because conviction required proof of knowing and active membership in organization and intent to contribute to success of specifically illegal activities).

No such concern arises with respect to § 2339B, however, because, as we have already observed, that statute does not prohibit simple membership in a terrorist organization. Rather, the statute prohibits the knowing provision of material support to a known terrorist organization. Proof of such provision (whether actual, attempted, or conspiratorial) together with the dual knowledge elements of the statute is sufficient to satisfy the personal guilt requirement of due process.

In sum, Sabir fails to state a claim – much less demonstrate – that § 2339B is either

16

facially vague in violation of due process or overbroad in violation of the First Amendment.

        b.        <u>Sabir Fails To Demonstrate that § 2339B Is Unconstitutionally Vague as Applied to his Case</u>

            (1)    <u>Sabir's Vagueness Claim Is Properly Reviewed as Applied</u>

In the absence of First Amendment concerns, courts generally view vagueness challenges to a statute as applied to the defendant's case. <u>See</u> <u>Chapman v. United States</u>, 500 U.S. 453, 467 (1991) ("First Amendment freedoms are not infringed by [the statute at issue], so the vagueness claim must be evaluated as the statute is applied."); <u>accord</u> <u>United States v. Williams</u>, 553 U.S. at 304; <u>United States v. Rybicki</u>, 354 F.3d at 129-30 (collecting cases).[9] This preference for as-applied review is "'[e]mbedded in the traditional rules governing constitutional adjudication,'" notably, in "'the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.'" <u>Parker v. Levy</u>, 417 U.S. 733, 759 (1974) (quoting <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 610 (1973)). That principle, grounded in the separation of powers, serves the jurisprudential maxim that "as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid," a court's "plain duty is to adopt that which will save the Act" enacted by Congress. <u>Blodgett v. Holden</u>, 275 U.S.

---

[9] In <u>Holder v. Humanitarian Law Project</u>, the Supreme Court expressed a preference for as-applied review even where First Amendment rights are implicated. <u>See</u> 130 S. Ct. at 2719.

17

142, 148 (1927) (Holmes, J.); see Rust v. Sullivan, 500 U.S. 173, 190 (1991) (noting courts' "categorical" duty to seek "every reasonable construction . . . to save a statute from unconstitutionality" (emphasis in original; internal quotation marks omitted)).

To the extent the Supreme Court has suggested that a facial challenge may be maintained against a statute that does not reach conduct protected by the First Amendment, the identified test is, in fact, only a variation on as-applied analysis, requiring the defendant to show "that the law is impermissibly vague in all of its applications." Village of Hoffman Estates v. Flipside Hoffman Estates, Inc., 455 U.S. 489, 497 (1982); accord United States v. Salerno, 481 U.S. 739, 745 (1987) (observing that defendant mounting facial challenge bears heavy burden because he "must establish that no set of circumstances exists under which the Act would be valid"). In practice, the Hoffman Estates/Salerno rule warrants hypothetical analysis of "all applications" only in cases of pre-enforcement facial vagueness challenges. See, e.g., Richmond Boro Gun Club, Inc. v. City of New York, 97 F.3d 681, 684-86 (2d Cir. 1996). Where, as here, a defendant has already been convicted for specific conduct under the challenged law, Hoffman Estates itself instructs a court confronting a facial challenge to "examine the complainant's conduct before analyzing other hypothetical applications." Village of Hoffman Estates v. Flipside Hoffman Estates, Inc., 455 U.S. at 495.

Accordingly, our review of Sabir's vagueness challenge focuses on the application of § 2339B to the facts of his case.[10]

---

[10] City of Chicago v. Morales, 527 U.S. 41 (1999) (declaring local loitering ordinance unconstitutionally vague on its face), cited by Sabir, warrants no different approach to his

18

On as-applied review of the "notice" requirement of due process, courts ask whether the challenged "statute, as written, provides notice sufficient to alert 'ordinary people [as to] what conduct is prohibited.'" Arriaga v. Mukasey, 521 F.3d at 224 (quoting Kolender v. Lawson, 461 U.S. at 357). This test does not demand "'meticulous specificity'" in the identification of proscribed conduct. Id. (quoting Grayned v. City of Rockford, 408 U.S. 104, 110 (1972) (noting that such standard would come at cost of "flexibility and reasonable breadth" (internal quotation marks omitted))). Rather, it requires only that the statutory language "'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.'" Id. (quoting Jordan v. DeGeorge, 341 U.S. 223, 231-32 (1951)).

Similarly, with respect to the due process concern of arbitrary enforcement, a statute certainly will not be deemed unconstitutionally vague if "'as a general matter,'" it "'provides sufficiently clear standards to eliminate'" such a risk. Id. (quoting Farrell v. Burke, 449 F.3d 470, 494 (2d Cir. 2006)). But even "'in the absence of such standards,'" a statute will survive an as-applied vagueness challenge if "'the conduct at issue falls within the core of

---

facial vagueness claim. Morales is distinguishable from this case in that the ordinance there at issue (1) reached a substantial amount of innocent conduct, (2) lacked a mens rea requirement to mitigate overbreadth concerns, and (3) had been interpreted by the state supreme court in a way that precluded the Supreme Court from adopting a narrow construction avoiding constitutional concerns. See id. at 60-64; see also United States v. Rybicki, 354 F.3d at 150-52 (Raggi, J., concurring) (discussing circumstances in Morales that precluded Hoffman Estates/Salerno analysis). Because none of these concerns is here present, we rely on traditional as-applied review in considering Sabir's vagueness challenge.

19

the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute.'" Id. (quoting Farrell v. Burke, 449 F.3d at 494).

Applying these principles to this case, we identify no unconstitutional vagueness in § 2339B as applied to Sabir's case.

(3) Sabir's Vagueness Challenge to the Statutory Proscriptions Fails

Sabir contends that the statutory terms at issue – "training," "personnel," and "expert assistance and advice" – are inherently too vague to provide the notice and direction required by due process. Such a general complaint is now foreclosed by Holder v. Humanitarian Law Project. The Supreme Court there observed that these terms did not require the sort of "untethered, subjective judgments" that had compelled it to strike down statutes tying criminal culpability to vague concepts such as "annoying" or "indecent" conduct. 130 S. Ct. at 2720. The Court identified further protection against vagueness in Congress's addition of "narrowing definitions" for these terms, which "increased the[ir] clarity," as well as in the knowledge element required for a § 2339B conviction. Id.

Sabir's more specific challenges to the application of these terms to the particular facts of his case are equally meritless.

To the extent Sabir was convicted of conspiring with Shah to provide "training" – i.e., "instruction or teaching designed to impart a specific skill, as opposed to general knowledge," 18 U.S.C. § 2339A(b)(2) – to a known terrorist organization, a person of

20

"ordinary intelligence," Grayned v. City of Rockford, 408 U.S. at 108, would require nothing more than "common understanding," Jordan v. DeGeorge, 341 U.S. at 232, to recognize that this prohibition plainly encompassed "martial arts training and instruction for jihadists" serving al Qaeda, Indictment ¶¶ 1-2. In Holder v. Humanitarian Law Project, the Supreme Court held that "[a] person of ordinary intelligence would understand that instruction on resolving disputes through international law falls within the statute's definition of 'training' because it imparts a 'specific skill,' not 'general knowledge.'" 130 S. Ct. at 2720. That conclusion is even more apparent here, where the trial evidence showed that the martial arts training Shah proposed to provide was specific and deadly and hardly a matter of general knowledge. See, e.g., GX 814T at 3-4 (recording Shah's explanation of how to kill a man by ripping out his throat). Moreover, al Qaeda's history for using murderous terrorism in an attempt to intimidate civilian populations and governments, see 18 U.S.C. § 2331 (defining terrorism) – particularly American civilians and the United States government – is so well known that no reasonable person could doubt that training al Qaeda members in martial arts is precisely the sort of material support proscribed by § 2339B, see Arriaga v. Mukasey, 521 F.3d at 224; United States v. Rybicki, 354 F.3d at 129.

We likewise reject Sabir's vagueness challenge to the term "personnel" as applied to his case. The provision of personnel is prohibited by § 2339B only when an individual knowingly provides, attempts to provide, or conspires to provide a foreign terrorist organization with one or more individuals, including himself, "to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct [its]

21

operation." 18 U.S.C. § 2339B(h). Quite apart from Shah's offer to act as a martial arts trainer for al Qaeda in that organization's pursuit of jihad, Sabir's offer to serve as an on-call doctor for the organization, standing ready to treat wounded mujahideen in Saudi Arabia, falls squarely within the core of this prohibition, defeating any suggestion either that he lacked notice that his conduct was unlawful or that the statute was enforced arbitrarily with respect to him. See Farrell v. Burke, 449 F.3d at 494; United States v. Rybicki, 354 F.3d at 129.

In an effort to avoid this conclusion, Sabir argues that his offer of life-saving medical treatment was simply consistent with his ethical obligations as a physician and not reflective of any provision of support for a terrorist organization. The record does not support this characterization. Sabir was not prosecuted for performing routine duties as a hospital emergency room physician, treating admitted persons who coincidentally happened to be al Qaeda members. Sabir was prosecuted for offering to work for al Qaeda as its on-call doctor, available to treat wounded mujahideen who could not be brought to a hospital precisely because they would likely have been arrested for terrorist activities. See GX 906T at 49, 69. In offering this support for al Qaeda, Sabir did not simply honor his Hippocratic oath. He swore a further oath of allegiance to al Qaeda, making clear that his treatment of wounded mujahideen would be provided not as an independent physician but as "one of the soldiers of Islam," duty bound to obey al Qaeda's leaders, including Osama bin Laden, and to protect his fellow "brothers on the path of Jihad" and "on the path of al Qaeda." Id. at 114-16. No reasonable person with a common understanding of al Qaeda's murderous objectives could

22

doubt that such material support fell squarely within the prohibitions of § 2339B. See Holder v. Humanitarian Law Project, 130 S. Ct. at 2721 (holding that statute limiting "personnel" to persons working under terrorist organization's direction or control, rather than independently, adequately avoided vagueness).

Nor is the statute's prohibition on the provision of "expert assistance and advice" to terrorist organizations unconstitutionally vague as applied to Sabir. As the district court correctly observed, the medical expertise of a licensed physician plainly constitutes "scientific, technical or other specialized knowledge" under 18 U.S.C. § 2339A.[11] See United States v. Shah, 474 F. Supp. 2d at 497 n.5. Indeed, such expertise requires more specialized knowledge than the instruction in relief application that the Supreme Court held "comfortably" to fall within the scope of "expert advice or assistance" in Holder v. Humanitarian Law Project, 130 S. Ct. at 2720. Any person of ordinary intelligence would readily recognize that such expert assistance (well outside the scope of one's regular hospital duties), with the stated object of permitting al Qaeda fighters to advance "on the path of Jihad" is exactly the sort of material support proscribed by § 2339B. See Arriaga v. Mukasey, 521 F.3d at 224; United States v. Rybicki, 354 F.3d at 129; cf. Watson v. Geren, 569 F.3d 115, 119, 134 (2d Cir. 2009) (upholding conscientious objector claim of doctor who refused to serve in United States Army based on belief that treating wounded soldiers would be functional equivalent of weaponizing human beings).

---

[11] This definition for the term "expert advice or assistance" is familiar from Fed. R. Evid. 702, governing expert witnesses.

23

Further, because Sabir's proffered support, whether viewed as training, personnel, or expert assistance, fell so squarely within the core of § 2339B's prohibition, the application of that law to his conduct cannot have been the product of arbitrary law enforcement. See Farrell v. Burke, 449 F.3d at 494.

(4) The "Medicine" Exception Does Not Render § 2339B Unconstitutionally Vague as Applied to Sabir

Sabir submits that, even if the training, personnel, and expert assistance provisions of the material support statute are not unconstitutionally vague as applied to his case, they are rendered so by vagueness in the statutory exemption of "medicine" from the definition of "material support." 18 U.S.C. § 2339A(b)(1); see Oral Arg. Tr. at 33 (Jan. 17, 2007) ("How is a person of ordinary intelligence supposed to determine we are talking about medicine, only medicine, but not the provision of medical treatment by a doctor?").

The task of interpreting a statute necessarily begins with its language. See Bailey v. United States, 516 U.S. 137, 144 (1995); United States v. Awadallah, 349 F.3d 42, 51 (2d Cir. 2003). Considered in isolation, the word "medicine" can convey various meanings, including both "a substance or preparation used in treating disease"[12] and "the science and art of dealing with the maintenance of health and the prevention, alleviation, or cure of disease." Webster's 3d New Int'l Dictionary 1402 (2002); see also 9 Oxford English Dictionary 549 (2d ed. 1989) (defining "medicine" as both "[a]ny substance or preparation

_____

[12] In this context, the word "preparation" obviously means "a substance specially prepared, or made up for its appropriate use or application, e.g. as food or medicine," not "the action of preparing." 12 Oxford English Dictionary 374 (2d ed. 1989).

24

used in the treatment of disease" and "[t]hat department of knowledge and practice which is concerned with the cure, alleviation, and prevention of disease in human beings, and with the restoration and preservation of health"). But we do not look at statutory language in isolation to determine if it provides adequate notice of conduct proscribed or permitted. Rather, we consider language in context, see Bailey v. United States, 516 U.S. at 145; see also Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997), and, where appropriate, with the benefit of canons of statutory construction, see United States v. Dauray, 215 F.3d 257, 262 (2d Cir. 2000), and legislative history, see Barenblatt v. United States, 360 U.S. 109, 117 (1959) (relying on "legislative gloss" to reject vagueness challenge to expansive construction of rule underlying conviction for contempt of Congress); United States v. Witkovich, 353 U.S. 194, 199 (1957) (observing that restrictive meaning of language may be indicated by, inter alia, "persuasive gloss of legislative history"); United States v. Harriss, 347 U.S. 612, 620 (1954) (relying in part on legislative history to construe statute to avoid vagueness challenge); United States v. Nadi, 996 F.2d 548, 550 (2d Cir. 1993) (rejecting vagueness challenge where "common sense interpretation of [statutory language at issue] is confirmed by the statute's legislative history").

The relevant context here starts with § 2339A(b)(1), which in cataloguing an expansive array of tangibles and intangibles that can constitute "material support or resources" notes two exceptions: "medicine or religious materials." Relevant context also extends to § 2339B(a)(1), the provision making it a crime to "provide" material support. In the context of a statute focused on things that might be provided to support a terrorist

25

organization, "medicine" is reasonably understood as a substance or preparation rather than as an art or science. "Providing medicine" is how common usage refers to the prescription of a substance or preparation to treat a patient. See, e.g., Grieveson v. Anderson, 538 F.3d 763, 774 (7th Cir. 2008) (addressing challenge to practice that allegedly "provide[d] inmates with quantities of medicine" that could allow them to overdose); El Badrawi v. Dep't of Homeland Sec., 258 F.R.D. 198, 202 (D. Conn. 2009) (addressing challenge to alleged failure to "provide" inmate with medicine); Celia W. Dugger, Nigeria: Help for Fighting Malaria, N.Y. Times, Oct. 24, 2009, at A8 (discussing organization's announcement to "provide enough medicine for 56 million malaria treatments"); Gardiner Harris, Institute of Medicine Calls for Doctors to Stop Taking Gifts from Drug Makers, N.Y. Times, Apr. 29, 2009, at A17 (discussing recommendation that doctors stop giving free drug samples to patients "unless the patient was poor and the doctor could continue to provide the medicine for little or no cost"). By contrast, "practicing medicine" is how common usage describes Sabir's proposed activity, i.e., employing the art or science of medicine to treat a patient. See, e.g., Smith v. Doe, 538 U.S. 84, 112 (2003) (Stevens, J., dissenting and concurring in the judgment) (noting that incompetent doctor "may not be permitted to practice medicine"); Planned Parenthood of S Penn. v. Casey, 505 U.S. at 884 (plurality opinion) (noting "practice of medicine" was "subject to reasonable licensing and regulation"); Harris v. Mills, 572 F.3d 66, 68-69 (2d Cir. 2009) (affirming dismissal of lawsuit arising from "revocation of [plaintiff's] license to practice medicine"). Where the word "provide" is used to describe the latter activity, reference ordinarily is made to "medical care," or "medical treatment," rather

26

than to "medicine" alone. <u>See, e.g.</u>, <u>Frew ex rel. Frew v. Hawkins</u>, 540 U.S. 431, 434 (2004) (noting requirement of Medicaid statute that state "provide various medical services to eligible children"); <u>Washington v. Harper</u>, 494 U.S. 210, 225-26 (1990) (describing state's interest with respect to mentally ill prison inmate "in providing him with medical treatment for his illness").

Moreover, Congress's intent to have the medicine exception in § 2339A(b)(1) reach no further than substances or preparations that might be provided to a terrorist organization is stated with particular clarity in the statute's legislative history. The House Conference Report accompanying the original legislation states that the word "'[m]edicine' should be understood to be limited to the medicine itself, and does not include the vast array of medical supplies." H.R. Conf. Rep. 105-518, at 114 (1996), <u>reprinted in</u> 1996 U.S.C.C.A.N. 944, 947. In drawing this distinction between "the medicine itself" and "medical supplies," Congress served clear notice that the medicine exception does not reach "the outer limits of its definitional possibilities," <u>Dolan v. U.S. Postal Serv.</u>, 546 U.S. 481, 486 (2006), but is confined to medical substances and preparations.

In short, context, common usage, and legislative history combine to serve on both individuals and law enforcement officers the notice required by due process that the medicine exception identified in § 2339A(b)(1) shields only those who provide <u>substances</u> qualifying as medicine to terrorist organizations. Other medical support, such as volunteering to serve as an on-call doctor for a terrorist organization, constitutes a provision of personnel and/or scientific assistance proscribed by law. <u>See</u> 18 U.S.C. §§ 2339A(b)(1), (3), 2339B(a)(1).

27

Accordingly, we identify no merit in Sabir's claim that § 2339B is unconstitutionally vague as applied to his case, and we decline to reverse his conviction as violative of the notice requirement of due process.

### B. The Trial Evidence Was Sufficient To Support Sabir's Conviction

Sabir contends that the evidence was insufficient to support his conviction. The rule of constitutional sufficiency, derived from the Due Process Clause, instructs that a conviction cannot be obtained "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime . . . charged." In re Winship, 397 U.S. 358, 364 (1970); accord United States v. Aguilar, 585 F.3d 652, 656 (2d Cir. 2009). A defendant raising a sufficiency challenge bears a heavy burden because a reviewing court must consider the totality of the evidence in the light most favorable to the prosecution and uphold the conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); accord United States v. Aguilar, 585 F.3d at 656. Applying these principles to Sabir's case, we reject his sufficiency challenge as without merit.

### 1. Count One: Conspiracy

In challenging his conviction for conspiracy to provide material support to a known terrorist organization, Sabir contends principally that the government failed to prove the existence of an agreement to violate § 2339B. We are not persuaded. To convict a defendant of conspiracy, the government must prove beyond a reasonable doubt "both the existence of the conspiracy alleged and the defendant's membership in it." United States v. Chavez, 549

28

F.3d 119, 125 (2d Cir. 2008); see also id. ("The essence of any conspiracy is, of course, agreement, and in order to establish a conspiracy, the government must show that two or more persons entered into a joint enterprise with consciousness of its general nature and extent."). The trial evidence in this case easily satisfied these elements.

Testimonial evidence established that Shah and Sabir had long voiced interest in supporting jihad and mujahideen. See, e.g., Trial Tr. at 193-96 (reporting Shah preaching jihad and support for Osama bin Laden in late 1990s at Poughkeepsie mosque); id. at 287 (recounting Sabir's 2003 conversation with mujahideen fighter inquiring how Sabir could help with jihad). It is against this background that a jury would listen to the recorded conversation of March 4, 2004, in which Shah proposed to a federal undercover agent that Shah and Sabir – close friends for 25 years – join al Qaeda as "a pair, me and a doctor," to support that organization's pursuit of jihad. GX 902T at 23. More significantly, during the May 20, 2005 meeting at which Shah and Sabir formally swore allegiance and promised support to al Qaeda, Shah by providing al Qaeda members with martial arts training and Sabir by treating wounded al Qaeda members in Riyadh, see GX 906T at 106-16, Sabir acknowledged that he and Shah had talked "for a long time" about supporting jihad, id. at 110. Sabir plainly viewed his and Shah's actions at the May 20 meeting as part of their common agreement. When Agent Soufan observed that neither man was obligated to support al Qaeda, Sabir responded that to fail to do so would be to "abandon[] my brother (Shah)" with respect to "the very thing we agreed upon . . . in the first place." Id.

Accordingly, we identify no merit in Sabir's sufficiency challenge to his conviction

29

for conspiracy to provide material support to a known terrorist organization.

### 2. Count Two: Attempt

Equally meritless is Sabir's argument that the evidence was insufficient to support his conviction for attempting to provide material support to a known foreign terrorist organization. A conviction for attempt requires proof that a defendant (a) had the intent to commit the object crime and (b) engaged in conduct amounting to a substantial step towards its commission. See, e.g., United States v. Yousef, 327 F.3d 56, 134 (2d Cir. 2003).

#### a. Intent

Sabir does not challenge the sufficiency of the evidence establishing his intent to provide material support to a foreign terrorist organization. Nor could he.[13] In addition to Sabir's statements already quoted in this opinion, see supra at **[5-6, 21, 27-28]**, which constitute powerful evidence of the requisite intent, the following transcript excerpts from the May 20, 1995 meeting further support this element.

After Sabir advised that his work in a Riyadh military hospital would put him in Saudi Arabia for two years, Agent Soufan stated that Sabir could help al Qaeda "[a]s a doctor . . .

___

[13] The intent required to prove attempted material support for a foreign terrorist organization should not be confused with an intent to further terrorism. Just as that latter intent is not required to prove an actual § 2339B violation, see Holder v. Humanitarian Law Project, 130 S. Ct. at 2717 ("Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities."), it is not required to prove a conspiracy or attempt to violate that statute. Nevertheless, in this case, much of the evidence proving Sabir's intent to provide material support also indicates his intent to further terrorism.

as a Mujahid." GX 906T at 19. Sabir not only signaled assent, he emphasized a need to "feel sure within myself that if I make a certain move, that move is going to be effective." Id. To provide that assurance, Agent Soufan clarified how a doctor could be helpful to al Qaeda's pursuit of jihad. He stated that Osama bin Laden himself had told Soufan that "we need doctors if they are trusted." Id. at 32. Soufan explained that "brothers" sometimes get "hurt with a bullet" during "training" and in "operation[s]." Id. at 48-49. Because they cannot "go to a hospital," the organization needs "doctor brothers . . . to protect them . . . [to] keep the other brothers healthy." Id. at 49.[14] Sabir readily agreed to provide that support, stating, "Let me give you another number," whereupon he supplied his personal mobile telephone number, which, with Soufan's assistance, he rendered into code. Id. at 48-50.[15] Sabir understood that the purpose of the code was to conceal the fact that he was working for al Qaeda: Persons who learn the number "may not . . . understand [its] significance . . . .

---

[14] Evidence of terrorist efforts to recruit doctors was adduced at trial in United States v. Abu-Jihaad, --- F.3d ----, ----, 2010 WL 5140864, at *1 (2d Cir. 2010) (describing website post soliciting persons to provide "battlefield medical services" in Afghanistan (internal quotation marks omitted)).

[15] Sabir had earlier provided Soufan with a contact number in response to the undercover agent's offer of assistance with "anything" Sabir might "need" in Saudi Arabia. GX 906T at 40. In extending this offer, the undercover made clear that such assistance would come from mujahideen: "[W]e have a lot of brothers, *thank God,* mujahideen . . . . [T]hey will uh be very happy to assist another brother . . . . [T]hey still work in their jobs with the government . . . but uh their hearts and minds are on the right track." Id. at 15 (italics in transcript reflect translation from Arabic to English). Without prompting, Sabir stated, "I would like to meet them," proposing an exchange of contact numbers: "Even if you just give me one person that I can contact over there, but I can give you my, my mobile phone over there, the number I can give." Id. at 40.

They may not even recognize it as a telephone number." Id. at 51. He also understood that the coded number would be provided to a trusted al Qaeda operative, who would identify himself as "Mus'ab" when contacting Sabir on behalf of a wounded jihadist. Sabir responded to this information, "*God willing*." Id. at 87 (italics in transcript reflect translation from Arabic to English).

Still later in the conversation, when Agent Soufan emphasized to Sabir that he could decline to treat mujahideen if he was not committed to al Qaeda's goals, Sabir made plain that he had no reservations about using his medical expertise to support al Qaeda: "I will [do what]ever I can do for the sake of God. . . . This is my job . . . the best I can do is to benefit those people . . . who are striving in the way of Allah . . . . [T]hese are the ones that are most deserving of the help." Id. at 66. When Soufan further stated that it was difficult to take mujahideen to a hospital for treatment, Sabir emphasized that his military identification allowed him to travel freely around Saudi Arabia, thereby suggesting that he could go to the injured person. "[I]t's almost like carte blanche. . . . It's like you can go where you want to go with this . . . . And anybody that sees it, they don't touch you." Id. at 67. Later, Soufan sought to confirm this understanding, stating "[t]hat ID will be very good for you . . . because you can definitely help mujahideen now," to which Sabir responded, "Yes, yes." Id. at 69.

With evidence of his intent thus clearly established, Sabir focuses his sufficiency challenge on the "substantial step" element of attempt.

        b.     Substantial Step

            (1)     The "Substantial Step" Requirement Expands Attempt

32

<u>Beyond the Common Law</u>

The "substantial step" requirement for attempt derives from the American Law Institute's Model Penal Code, which in the early 1960s sought to "widen the ambit of attempt liability." <u>United States v. Ivic</u>, 700 F.2d 51, 66 (2d Cir. 1983) (Friendly, J.) (citing Model Penal Code § 5.01(1)(c) (Proposed Official Draft 1962)), <u>overruled on other grounds by National Org. for Women, Inc. v. Scheidler</u>, 510 U.S. 249, 254-55, 262 (1994). Previously, at common law, attempt had been limited to conduct close to the completion of the intended crime. <u>See generally</u> <u>People v. Werblow</u>, 241 N.Y. 55, 69, 148 N.E. 786, 789 (1925) (Cardozo, J.) (holding that, to constitute attempt, suspect's conduct must "carry the project forward within dangerous proximity to the criminal end to be attained"); <u>Commonwealth v. Peaslee</u>, 177 Mass. 267, 272, 59 N.E. 55, 56 (1901) (Holmes, J.) (recognizing that "some preparations may amount to an attempt" when they come "very near to the accomplishment of the act"). By requiring proof only of a "substantial step" in furtherance of the intended crime, the Model Code ushered in a broader view of attempt.

This court effectively adopted the Model Code's formulation of attempt in <u>United States v. Stallworth</u>, 543 F.2d 1038, 1040-41 (2d Cir. 1976). The <u>Stallworth</u> defendants were arrested when their planned armed robbery was "in progress" and "[a]ll that stood between [them] and success was a group of F.B.I. agents and police officers." <u>Id.</u> at 1041. As such evidence would have demonstrated attempt even under the common law, the significance of the case rests not on its facts but on the court's approving citation to the Model Code's identification of a range of conduct – not always proximate to the desired criminal end – that

33

might nevertheless constitute a substantial step when "strongly corroborative of the firmness of the defendant's criminal intent."  Id. at 1040 & n.5; see also id. at 1041 (observing that application of Model Code "emphasizes the importance of a rule [of attempt] encouraging early police intervention where a suspect is clearly bent on the commission of crime").  Accord United States v. Crowley, 318 F.3d 401, 408 (2d Cir. 2003); United States v. Ivic, 700 F.2d at 66.  Thus, a "substantial step" must be "something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime."  United States v. Manley, 632 F.2d 978, 987 (2d Cir. 1980).  It is conduct "'planned to culminate'" in the commission of the substantive crime being attempted.  United States v. Ivic, 700 F.2d at 66 (quoting Model Penal Code § 5.01(c) (Proposed Official Draft 1962)).[16]

> (2)  Identifying a Substantial Step by Reference to the Crime Being Attempted

While the parameters of the substantial step requirement are simply stated, they do not always provide bright lines for application.  This is not surprising; the identification of a substantial step, like the identification of attempt itself, is necessarily a matter "'of degree,'" United States v. Coplon, 185 F.2d 629, 633 (2d Cir. 1950) (L. Hand, J.) (quoting

---

[16] In Ivic, the court upheld convictions for attempting to bomb two locations, observing that defendants' inspection of one bombing site, construction of a fully operational bomb, and transportation of the bomb to the vicinity of the target site satisfied even the common law standard of attempt, while defendants' discussion and authorization of the second bombing, examination of the target site, and possession of explosives satisfied the Model Code standard, albeit barely.  See United States v. Ivic, 700 F.2d at 67.

34

Commonwealth v. Peaslee, 177 Mass. at 272, 59 N.E. at 56), that can vary depending on "'the particular facts of each case'" viewed in light of the crime charged, United States v. Ivic, 700 F.2d at 66 (quoting United States v. Manley, 632 F.2d at 988)); accord United States v. Crowley, 318 F.3d at 408. An act that may constitute a substantial step towards the commission of one crime may not constitute such a step with respect to a different crime. See generally United States v. Ivic, 700 F.2d at 66 (observing that substantial step requirement serves to ensure that person is convicted for attempt only when actions manifest "firm disposition" to commit charged crime). Thus, substantial-step analysis necessarily begins with a proper understanding of the crime being attempted.

For example, in United States v. Delvecchio, 816 F.2d 859 (2d Cir. 1987), a case frequently cited as illustrative of actions insufficient to demonstrate attempt, the substantive crime at issue was possession of a large quantity of heroin. We held that a substantial step to commit that crime was not established by proof that defendants had met with suppliers, agreed on terms, and provided their beeper numbers. Such evidence, at most, established a "verbal agreement," which, "without more, is insufficient as a matter of law to support an attempt[ed possession] conviction." Id. at 862. In so concluding, we noted that what was missing was any act to effect possession, such as acquisition, or attempted acquisition, of the purchase money, or travel to the agreed-on purchase site. See id.

The crime here at issue, however, is of a quite different sort. Sabir was charged with attempting to provide material support for terrorism. Whereas an attempt to possess focuses on a defendant's efforts to acquire, an attempt to provide focuses on his efforts to supply, a

35

distinction that necessarily informs an assessment of what conduct will manifest a substantial step towards the charged objective. Thus, while an agreement to purchase drugs from a supplier is not a substantial step sufficient to convict for attempted possession, see id. at 862, such an agreement to acquire might constitute a substantial step when the crime at issue is attempted distribution, see United States v. Rosa, 11 F.3d 315, 340 (2d Cir. 1993) (holding evidence insufficient to prove attempted distribution where defendant "did not produce any heroin for the proposed sale . . ., and there was no evidence that [he] ever entered into an agreement with a supplier or made inquiry of a supplier to obtain heroin for the proposed sale").

Further important to a substantial-step assessment is an understanding of the underlying conduct proscribed by the crime being attempted. The conduct here at issue, material support to a foreign terrorist organization, is different from drug trafficking and any number of activities (e.g., murder, robbery, fraud) that are criminally proscribed because they are inherently harmful. The material support statute criminalizes a range of conduct that may not be harmful in itself but that may assist, even indirectly, organizations committed to pursuing acts of devastating harm. Thus, as the Supreme Court recently observed, the very focus of the material support statute is "preventative" in that it "criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." Holder v. Humanitarian Law Project, 130 S. Ct. at 2728. Accordingly, while a substantial step to commit a robbery must be conduct planned clearly to culminate in that particular harm, a substantial step towards the provision of material support need not be planned to culminate

36

in actual terrorist harm, but only in support – even benign support – for an organization committed to such harm.  See generally id. at 2724 (discussing Congress's finding that designated foreign terrorist organizations "'are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct'" (quoting AEDPA § 301(a)(7), 110 Stat. at 1247) (emphasis in Humanitarian Law Project).

> (3)　The Evidence Manifests a Substantial Step Towards the Provision of Material Support in the Form of Personnel

The indictment charged Sabir with attempting to supply al Qaeda with material support in three of the forms proscribed in 18 U.S.C. § 2339A(b)(1): "personnel, training, and expert advice and assistance."  Indictment ¶ 2.[17]  We conclude that the evidence was

---

[17] With respect to "personnel," Sabir and Shah were alleged to have

> knowingly provided, and attempted to provide, (i) one or more individuals (including themselves) to work under al Qaeda's direction and control and to organize, manage, supervise, and otherwise direct the operation of al Qaeda.

Indictment ¶ 2.  With respect to "training," Sabir and Shah were alleged to have

> knowingly provided, and attempted to provide, . . . (ii) instruction and teaching designed to impart a special skill to further the illegal objectives of al Qaeda.

Id.  With respect to "expert advice and assistance," Sabir and Shah were alleged to have

> knowingly provided, and attempted to provide, . . . (iii) advice and assistance derived from scientific, technical, and other specialized knowledge to further the illegal objectives of al Qaeda, to wit, [Shah] provided and attempted to provide martial arts training and instruction for jihadists, and [Sabir] provided and attempted to provide medical support to wounded jihadists knowing that al Qaeda has engaged and engages in terrorist activity . . . and that al Qaeda has engaged and engages in terrorism.

37

sufficient to support Sabir's conviction for attempting to provide material support in the form

of personnel – specifically, himself – to work for al Qaeda as a doctor on-call to treat

wounded jihadists in Saudi Arabia. See United States v. McCourty, 562 F.3d 458, 471 (2d

Cir. 2009) (recognizing that when theories of liability are pleaded in conjunctive, defendant

may be found guilty on proof of any one theory); United States v. Masotto, 73 F.3d 1233,

1241 (2d Cir. 1996) (holding evidence sufficient to affirm if reasonable jury could have

convicted on any theory charged).[18] By coming to meet with a purported al Qaeda member

on May 20, 1995; by swearing an oath of allegiance to al Qaeda; by promising to be on call

in Saudi Arabia to treat wounded al Qaeda members; and by providing private and work

contact numbers for al Qaeda members to reach him in Saudi Arabia whenever they needed

treatment, Sabir engaged in conduct planned to culminate in his supplying al Qaeda with

---

Id.

      While our dissenting colleague submits that the government consistently focused on the last form of material support charged, see Dissenting Op., post at **[4 n.2]**, we do not understand it to have abandoned the first two. Quite the contrary, the government referenced personnel in summation, arguing that Sabir "tried to put himself in al Qaeda's back pocket when he gave [the undercover] his phone numbers." Trial Tr. at 2374 (explaining further that al Qaeda benefitted by thus acquiring "an asset that it didn't have before . . . the telephone number of a doctor . . . willing and able to come to [its] aid 24 hours a day"). Moreover, the district court charged the jury as to each of the three forms of material support alleged in the indictment and their distinct meanings, and further instructed that proof beyond a reasonable doubt of an attempt to provide material support in any of these forms was sufficient to support a guilty verdict. See id. at 2586-87.

[18] In light of this conclusion, we need not discuss the sufficiency of the evidence to support Sabir's Count Two conviction on any other theory. Specifically, we need not consider the government's argument that Sabir was guilty of aiding and abetting Shah's attempt to provide material support to al Qaeda in the form of martial arts training. See Griffin v. United States, 502 U.S. 46, 56-60 (1991).

personnel, thereby satisfying the substantial step requirement.[19]

        (4)     The Dissent's Mistaken View of the Substantial Step Requirement

            (a)     Sabir Did More Than Express a Radical Idea When He Produced Himself as a Doctor Sworn To Work Under the Direction of al Qaeda

In dissent, Chief Judge Dearie asserts that by upholding Sabir's attempt conviction on the record evidence, we approve punishing a defendant for radical thoughts rather than criminal deeds. See Dissenting Op., post at **[16]**. We do no such thing. Sabir's words and actions on May 20, 1995, did more than manifest radical sympathies. See United States v. Crowley, 318 F.3d at 408 (observing that substantial step requirement ensures that attempt does not punish persons "for their thoughts alone"). By attending the May 20, 2005 meeting and committing to work under al-Qaeda's direction and control as an on-call doctor, Sabir physically produced the very personnel to be provided as material support for the terrorist organization: himself. This supplying of the proscribed object is precisely the sort of substantial step that was missing in United States v. Rosa, 11 F.3d at 340 (holding evidence insufficient to support conviction for attempt to distribute heroin in absence of proof that defendant ever "produce[d] any heroin" or reached agreement with heroin supplier to acquire

---

[19] Judge Raggi is of the view that, if the circumstances on May 20, 2005, had been as Sabir believed, i.e., if Agent Soufan had been a member of al Qaeda, the evidence was otherwise sufficient to support a finding that Sabir actually provided, and not simply attempted to provide, himself as personnel to work under the direction of that terrorist organization. The court does not rule on that question as our rejection of Sabir's sufficiency challenge to attempt supports affirmance of his conviction.

heroin for planned distribution).

Viewed in this context, Sabir's oath of allegiance to al Qaeda evidenced more than "mere membership" in that terrorist organization. Holder v. Humanitarian Law Project, 130 S. Ct. at 2719 (holding that § 2339B does not criminalize "mere membership" in designated terrorist organization; it prohibits providing "material support" to that group). Sabir's purpose in swearing bayat was to formalize his promise to work as a doctor under the organization's direction and control.[20] That is most certainly evidence of a crime: the charged crime of attempting to provide material support to terrorism in the form of personnel. See 18 U.S.C. § 2339B(h) (clarifying that what is proscribed is the provision of personnel "to work under" the "direction or control" of a terrorist organization). Further, by providing his contact numbers, Sabir took a step essential to provide al Qaeda with personnel in the form of an on-call doctor: he provided the means by which mujahideen in Riyadh could reach that doctor at any time, day or night, that they needed emergency treatment. From the totality of these facts, a reasonable jury could have concluded that on May 20, 2005, Sabir crossed the line from simply professing radical beliefs or joining a radical organization to attempting a crime, specifically, Sabir's provision of himself as personnel to work under the direction and control of al Qaeda.

---

[20] Before Sabir took the oath, Agent Soufan had explained that Osama bin Laden and Ayman Zawahiri required a pledge from all persons proposing to work for al Qaeda to ensure that the persons "won't be acting on their own," but following leadership direction. GX 906T at 97-98 (explaining that everything within al Qaeda was "very, very controlled," but emphasizing that "nobody is forced" to take the oath; "there is no *coercion in religion*").

(b)  The Provision of Personnel and the Subsequent
Provision of Expert Services by Such Personnel
Are Distinct Forms of Material Support

Chief Judge Dearie submits that the time and distance to be traveled by Sabir before

he actually provided any medical treatment to al Qaeda warriors was too great to permit a

jury to find that his actions constituted a substantial step towards commission of the charged

crime.  See Dissenting Op., post at **[9, 12]**.  This mistakenly equates the provision of

personnel to a terrorist organization with the subsequent provision of services by that

personnel, a misapprehension that pervades the dissent and informs its conclusion that Sabir

stands guilty "for an offense that he did not commit."  Id. at **[20]**.  While it may frequently

be the case that a defendant who intends to provide a terrorist organization with personnel

also intends for the personnel to provide the organization with services, § 2339A(b)(1)

specifically recognizes "personnel" and "services" – particularly services in the form of

"expert advice and assistance," such as medical treatment – as distinct types of material

support.[21]  Thus, even if the provision (or attempted provision) of these two forms of material

support may be simultaneous in some cases, it may not be in others.  For that reason,

evidence sufficient to demonstrate a substantial step towards the provision of personnel may

not always be sufficient to demonstrate a substantial step towards the personnel's provision

of services.  Whether or not Sabir's May 20, 2005 actions were a substantial step in the

_____

[21] Section 2339A(b)(1) broadly defines "material support or resources" to mean "any
property, tangible or intangible, or service," of which "personnel" and "expert advice or
assistance," are examples.  See supra at **[10]**.

41

provision of expert medical services to terrorists, we conclude that they were a substantial step in the provision of Sabir himself as personnel.

To illustrate, assume that, instead of offering himself as an on-call doctor to al Qaeda, Sabir had recruited a doctor who was, in all respects, identically situated to himself. Assume further that Sabir then brought that doctor to a meeting in New York where the doctor swore allegiance to al Qaeda, promised a supposed al Qaeda member that he would work as an on-call doctor for the organization, and gave the member contact numbers so that wounded jihadists in Saudi Arabia could reach the doctor when necessary. Even the dissent concedes that such evidence would be sufficient to prove Sabir "guilty of attempting to provide personnel," although the recruited doctor would not provide actual medical services until some time in the future and after he traveled from New York to Saudi Arabia. Dissenting Op., post at **[11]**. Because Sabir would be guilty of attempting to provide personnel in the circumstances hypothesized, we think it necessarily follows that he is equally guilty on the record facts. He is guilty of attempting to provide himself as personnel to al Qaeda on May 20, 2005, even if he is not yet guilty of attempting to provide medical services to that organization.

In concluding otherwise, Chief Judge Dearie submits that the recruiter in the hypothetical "has done something. He has provided a service to the organization." Id. By contrast, he submits that Sabir "has done nothing more than conspire." Id. at 12.[22] We

_____

[22] Of course, Sabir could not conspire with the undercover agent. Sabir's conspiracy conviction in this case is supported by his agreement with co-defendant Shah, an agreement

42

disagree. Section 2339(B) criminalizes providing personnel through self-recruitment (i.e., volunteering oneself to serve under the direction of a terrorist organization) no less than through recruitment (securing another person to serve under such direction).[23] By volunteering himself as an on-call doctor for al Qaeda, Sabir rendered, or attempted to render, that organization as much of a service in producing personnel as the recruiter who solicited a doctor for that purpose. To hold otherwise would be to apply a different standard of sufficiency to the provision of personnel depending on whether the person being provided is oneself or another, a distinction for which there is no support in a statute that equally proscribes the provision of oneself or another to work under the direction of a terrorist organization.

Chief Judge Dearie suggests that a constitutional concern arises when a defendant is prosecuted for providing himself rather than a third party as personnel because in the former circumstance a defendant "'could be punished for, in effect, providing [himself] to speak out in support of the program or principles of a foreign terrorist organization, an activity protected by the First Amendment.'" Dissenting Op., post at **[10 n.10]** (quoting United States v. Stewart, 590 F.3d 93, 118 (2d Cir. 2009) (dictum)). The Supreme Court, however,

reached even before the May 20, 2005 meeting.

[23] The fact that the dictionary defines "personnel" by reference to a "body of people," see Dissenting Op., post at **[13 n.7]** (quoting Oxford English Dictionary), is of no import here where the relevant statutes, 18 U.S.C. §§ 2339A(b)(1), 2339B, state that "personnel" means "1 or more individuals who may be or include oneself," see, e.g., Colautti v. Franklin, 439 U.S. 379, 392 n.10 (1979) (referencing rule of construction that statutory definition controls meaning of terms).

has now held otherwise, explaining that the material support statute leaves persons free to engage in "independent advocacy," proscribing only conduct "directed to, coordinated with, or controlled by foreign terrorist groups." Holder v. Humanitarian Law Project, 130 S. Ct. at 2728; see id. at 2721 (observing that § 2339B "makes clear that 'personnel' does not cover independent advocacy" (emphasis in original)).

Here, there is no question that Sabir was providing himself to work under the direction and control of al Qaeda – the jury heard him solemnly swear to do so. By dismissing this evidence as "insubstantial" and "immaterial," and demanding proof of a greater level of "engagement, activity or compliance" to support conviction, Dissenting Op., post at **[20]**, our dissenting colleague persists in conflating the provision of personnel with the provision of services by that personnel. While the latter form of material support may require proof of particular engagement or activity, the former focuses on submission to the direction and control of a terrorist organization.[24]

---

[24] Many of the district court cases cited by the dissent treat direction and control, not a particular level of activity, as the critical fact in assessing a provision of personnel charge. See, e.g., United States v. Taleb-Jedi, 566 F. Supp. 2d 157, 176 (E.D.N.Y. 2008) (rejecting defendant's First Amendment challenge to proscription on providing personnel, observing that statute prohibits person from working under "terrorist organization's direction or control" no matter how benign the work); United States v. Lindh, 212 F. Supp. 2d 541, 573 (E.D. Va. 2002) (holding that provision of personnel requires proof of more than defendant's "mere presence" among members of terrorist organization: "'Personnel' refers to individuals who function as employees or quasi-employees – those who serve under the foreign entity's direction or control."); see also United States v. Abu-Jihaad, 600 F. Supp. 2d 363, 401 (D. Conn. 2009) (holding that defendants transmittal of national defense information to publisher linked to al Qaeda was insufficient to prove defendant's provision of himself as personnel in absence of evidence as to whether information was provided in response to publisher's request – which would permit finding that defendant had provided himself as personnel – or

The importance of the distinction we draw between the evidence necessary to prove a defendant's provision of personnel to a terrorist organization and that personnel's subsequent provision of services to the organization reaches beyond this case. Experience teaches that terrorist organizations frequently recruit persons into their ranks at times and places removed from any service they might render. Thus, someone who supplies suicide bombers or pilots or chemists or doctors or simple foot soldiers to a terrorist organization may reasonably be understood to provide the organization with material support in the form of personnel when the recruited individuals pledge to work under the direction of the organization, even though they may not be called upon to render any particular service for months, years, or at all. By the same reasoning, when a person supplies himself as the bomber or pilot or doctor sought by the terrorist organization, he provides – or certainly attempts to provide – material support in the form of personnel as soon as he pledges to work under the direction of the organization. In both circumstances, the organization acquires an important asset, reserve personnel, which can facilitate its planning of future terrorism objectives. See generally Holder v. Humanitarian Law Project, 130 S. Ct. at 2725 (recognizing that material support not directly furthering terrorism can be valuable in "free[ing] up other resources within the organization that may be put to violent ends").

on defendant's whim – which would not), aff'd on other grounds, --- F.3d at ----, 2010 WL 5140864 at *32; United States v. Warsame, 537 F. Supp. 2d 1005, 1018 (D. Minn. 2008) (holding that defendant's participation in an al Qaeda training camp – a circumstance where control could easily be inferred – sufficed to demonstrate provision of himself as personnel, but mere communications with al Qaeda associates after return to Canada – a circumstance where control was not apparent – could not).

Thus, even if Sabir needed to return to Riyadh before he could provide actual medical services to members of al Qaeda – something he planned to do within two weeks, see GX906T at 15 – his actions on May 20, 2005, constituted a substantial step clearly intended to culminate in supplying himself as personnel to work under the direction of that terrorist organization.

      (c)  Upholding Sabir's Attempt Conviction Raises No Double Jeopardy Concerns

Chief Judge Dearie suggests that if we affirm Sabir's attempt conviction, a double jeopardy concern arises with respect to his conspiracy conviction. See Dissenting Op., post at **[15]**.[25] We do not share this concern, which Sabir himself does not raise. See, e.g., Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998).[26]

An attempt to provide personnel does not require proof of concerted action, an essential element of conspiracy. Moreover, a conspiracy requires only proof of an agreement

---

 [25] In raising this concern, our dissenting colleague submits that "[c]onspiracy charges unaccompanied by a completed substantive crime are relatively rare, and can be troubling when the available evidence leaves one to speculate whether the criminal objective would have been realized." Dissenting Op., post at **[17]**. We take exception to this broad generalization. A sufficiency challenge to a conspiracy conviction, whether standing alone or together with a substantive count, requires a review of the evidence in that particular case. Here, Chief Judge Dearie joins the panel in unanimously affirming Sabir's conspiracy conviction.

 [26] Although Sabir's attorney urged the district court to impose concurrent sentences, arguing that the conspiracy and substantive charges against him "are actually encompassed in the same conduct," Sentencing Tr., Nov. 28, 2007, at 13-14, this is not a double jeopardy claim, see United States v. Dixon, 509 U.S. 688, 704 (1993) (reversing Grady v. Corbin, 495 U.S. 508 (1990)).

46

to provide personnel, not any substantial step toward such provision. See, e.g., Blockburger

v. United States, 284 U.S. 299, 304 (1932); United States v. Basciano, 599 F.3d 184, 197-98

(2d Cir. 2010). As we have already observed, Sabir admitted reaching a conspiratorial

agreement with Shah even before the May 20, 2005 meeting. But it was only at the meeting

that Sabir took actions – volunteering himself as an on-call doctor for al Qaeda, swearing

obedience to that organization, and providing contact numbers so that al Qaeda members

could call him when they needed medical treatment – that permitted a reasonable jury to find

a substantial step manifesting Sabir's "firm disposition" to provide personnel. United States

v. Ivic, 700 F.2d at 66. We reject Chief Judge Dearie's characterization of this conduct as

merely passive.

(d)     No Government Conduct Precluded a Jury
Finding of a Substantial Step

Insofar as the dissent suggests that Sabir's words or actions were somehow prompted

by the undercover agent,[27] the insinuation of entrapment is so patently unwarranted that Sabir

himself waived this defense in the district court, precluding its consideration on appeal. See

Trial Tr. at 2387-89; see also United States v. Quinones, 511 F.3d 289, 321 (2d Cir. 2007)

(discussing true waiver). Even if the dissent intends to imply something less than

---

[27] The dissent submits that Sabir "chanted the mantra of a terrorist" because he was "led by the government agent and inspired by his co-defendant." Dissenting Op., post at **[17]**. What it fails to report is that before Sabir swore bayat, he detailed his understanding of the oath's "deepest significance," GX 906T at 112-13 (discussing historical origin of oath, which Sabir explained "formed *a trust*" that could not be achieved in any "other way . . . because you cannot be complete without it").

entrapment, the question of whether Sabir's recorded statements on May 20, 2005, were volunteered or solicited, firm or equivocal, was one of fact to be decided by the jury, which had the distinct advantage over this court of hearing both the recording of the May 20 meeting and Sabir's trial testimony.

Of course, in making its evaluation, the jury presumably considered facts elided by the dissent, which show that Sabir, far from being a gullible mark for al Qaeda recruitment, was a highly educated United States citizen, indeed, a trained scientist. We presume the jury also considered Sabir's statements that, before meeting Agent Soufan on May 20, 2005, Sabir had both (1) reached agreement with Shah that the two men would provide material support to al Qaeda, see GX 906T at 110, and (2) decided that he could only provide such support working within his area of expertise as a physician, see id. at 65-66. In this context, the jury could reasonably have concluded that Agent Soufan's statements did not lead Sabir into words and actions about which he had reservations. Rather, Soufan's statements served to ensure that when Sabir volunteered himself as an on-call doctor for al Qaeda and supplied contact numbers, he did so knowing and fully intending to provide personnel for the purpose of treating wounded jihad warriors and not innocent victims of terrorism.

In sum, we conclude that the totality of the evidence was more than sufficient to permit a reasonable jury to find that on May 20, 2005, Sabir took a substantial step intended to culminate in the provision of himself as personnel to work under the direction of al Qaeda. Accordingly, we uphold his convictions for both conspiring and attempting to provide material support to a foreign terrorist organization.

48

C.	The District Court Reasonably Rejected Sabir's *Batson* Challenge

Sabir, who is African-American, argues that the prosecution's use of peremptory challenges to excuse five African Americans from the jury in his case violated the Fourteenth Amendment's guarantee of equal protection as construed by the Supreme Court in Batson v. Kentucky, 476 U.S. 79 (1986).[28]  After an extensive inquiry, the district court rejected this argument, finding that each of the five challenges was supported by credible non-discriminatory reasons.  Such a ruling "represents a finding of fact," which we will not disturb in the absence of clear error.  Hernandez v. New York, 500 U.S. 352, 364, 369 (1991) (plurality opinion); see United States v. Lee, 549 F.3d 84, 94 (2d Cir. 2008); United States v. Taylor, 92 F.3d 1313, 1326 (2d Cir. 1996).  We identify no such error in this case.

A three-step inquiry guides a district court's evaluation of a Batson challenge:

First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

Snyder v. Louisiana, 552 U.S. 472, 476-77 (2008) (internal quotation marks and brackets omitted).  For purposes of this appeal, we assume that Sabir satisfied the "minimal burden" of a prima facie showing, Overton v. Newton, 295 F.3d 270, 279 n.10 (2d Cir. 2002), as he could do by reference to the government's overall exclusion rate for African-American prospective jurors, see Jones v. West, 555 F.3d 90, 98-99 (2d Cir. 2009).  Nor need we

---

[28] Four of the twelve jurors who deliberated in Sabir's case were African Americans. Of those four, one was excused before verdict.  See Fed. R. Crim. P. 23(b).

49

discuss the second prong of <u>Batson</u> analysis as Sabir does not – and cannot – contend that

the government failed to proffer reasons for its challenges that were racially neutral on their

face. <u>See generally</u> <u>Hernandez v. New York</u>, 500 U.S. at 360 (observing that at second step

of <u>Batson</u> analysis, explanation need not be persuasive; it need only be "based on something

other than the race of the juror"). Instead, we focus on Sabir's argument that with respect

to three of the five challenged African Americans – prospective jurors #5, #26, and #27 – the

reasons the government advanced were "clearly pretextual." Appellant's Br. at 57, 59, 61.[29]

Sabir's pretext argument is based largely – though not exclusively – on the

prosecution's purported failure to apply its proffered race-neutral reasons for excusing

African Americans to similarly situated prospective jurors of other races or ethnicities. Such

inconsistency can demonstrate a discriminatory intent. <u>See</u> <u>Miller-El v. Dretke</u>, 545 U.S.

231, 241 (2005) (observing that "[m]ore powerful than . . . bare statistics" in evidencing

[29] Because Sabir does not specifically challenge the district court's rejection of his <u>Batson</u> argument with respect to the two other African Americans excused by the prosecution – prospective jurors #14 and #49 – we deem the point abandoned. <u>See</u> <u>United States v. Draper</u>, 553 F.3d 174, 179 n.2 (2d Cir. 2009). We nevertheless note that the record does not support any such challenge. The district court expressly found that the prosecution was credibly concerned about these prospective jurors' initially expressed reservations about certain investigative techniques that were used to gather evidence in the case, <u>i.e.</u>, wiretapping (prospective juror #14) and the use of confidential informants (prospective juror #49). Such a credibility finding is entitled to considerable deference on appeal. <u>See</u> <u>United States v. Lee</u>, 549 F.3d at 94. As the district court correctly observed, the jurors' professed willingness to put their reservations aside meant only that the prosecution could not secure their removal for cause, not that it could not retain a credibly race-neutral concern supporting the exercise of a non-discriminatory peremptory challenge. Further, with respect to the prosecution's stated concern about prospective juror #49's difficulty of comprehension, the court's acknowledgment that it had itself observed the difficulty supports its finding that this too was a credible race-neutral reason for excusing the juror.

pretext for discrimination "are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve"); United States v. Thomas, 303 F.3d 138, 145 (2d Cir. 2002) ("Support for the notion that there was purposeful discrimination in the peremptory challenge may lie in the similarity between the characteristics of jurors struck and jurors accepted." (internal quotation marks omitted)).  The record in this case, however, does not demonstrate sufficient juror similarity to render clearly erroneous the district court's rejection of Sabir's Batson claim.

### 1.    Prospective Juror #5

The government cited three race-neutral reasons for excusing prospective juror #5: (1) his failure to secure appointment to the Boston police force might cause him to lean against law enforcement; (2) he was somewhat equivocal about his ability to set aside the view that he was frequently a victim of race discrimination, see Voir Dire Tr. at 11 ("I think I can give it the college try and be as fair as any other person could be."); and (3) his employment working with autistic children might make him less sympathetic to prosecution witnesses.  In arguing pretext, Sabir notes that the prosecution showed no comparable concern for equivocal responses from other jurors whose backgrounds raised questions about their impartiality.  We need not resolve the parties' dispute about the relative degrees of equivocation in various jurors' responses because the district court did not rely on this second proffered prosecution reason in rejecting Sabir's Batson challenge.  Nor did it rely on the third reason, which the government does not maintain on appeal.  Instead, the district court found that the prosecution had credibly demonstrated that it would have excused prospective

51

juror #5 for the first reason articulated regardless of race. See generally United States v. Douglas, 525 F.3d 225, 239 (2d Cir. 2008) (observing that where prosecution articulates multiple reasons for peremptory challenge, one of which is race, it must demonstrate that challenge would have been exercised for race-neutral reason in any event).

In challenging this conclusion, Sabir suggests that the lost job opportunity was effectively irrelevant as prospective juror #5 conceded that he did not satisfy the residency requirement for appointment. The district court, however, concluded from its own questioning of the juror that he manifested "excessive defensiveness" about the circumstances relating to his failure to secure the police appointment, which provided the government with a credible race-neutral basis for concern about his ability to be impartial toward law enforcement officials. Voir Dire Tr. at 123. This finding turned largely on the district court's assessment of the juror's demeanor and credibility, a matter "peculiarly within [its] province," Snyder v. Louisiana, 552 U.S. at 477 (internal quotation marks omitted), to which we accord "great deference," United States v. Lee, 549 F.3d at 94. Accordingly, we conclude that Sabir has failed to identify clear error in the district court's rejection of his Batson challenge with respect to prospective juror #5.

### 2. Prospective Juror #26

The government advanced four reasons for excusing prospective juror #26: (1) her work as a home health aide might cause her to sympathize with Sabir, a physician; (2) her friend's daughter's marriage to a man from Yemen might also make her sympathetic to Sabir's circumstances; (3) her purportedly disheveled appearance and lack of focus in

responding to questions raised attentiveness concerns; and (4) her regular viewing of three "CSI" television shows might lead her to have unrealistic expectations as to the prosecution's ability to produce technical and scientific evidence of guilt in every case.[30] While the district court did not agree with the prosecution's characterization of the prospective juror's appearance, it found the other identified concerns, including the juror's lack of focus, to constitute credible race-neutral grounds for the prosecution's exercise of a peremptory challenge.

In maintaining his claim of pretext on appeal, Sabir observes that the prosecution did not excuse non-African American venirepersons who worked in health care, notably prospective juror #19, who worked in a veterans' hospital. Nor did it excuse non-African Americans with ties to Muslims, such as prospective juror #69, who had dated a Muslim. The argument ignores the fact that neither of these prospective jurors demonstrated the range of concerns presented by prospective juror #26.[31] Certainly, neither presented a focus

---

[30] "CSI: Crime Scene Investigation," along with "CSI: Miami" and "CSI: NY," are a trio of popular television series about fictitious teams of forensic investigators who solve crimes by applying science and technology to the review of physical evidence. See "CSI: Crime Scene Investigation," http://www.cbs.com/primetime/csi/.

[31] Because Sabir challenges the prosecution's professed concern about prospective juror #26's possible link to a person from Yemen only on pretext grounds (based on dissimilar treatment of another juror), and because other concerns about #26 defeat the pretext claim, we need not here decide under what circumstances a prospective juror's association with a person of a particular nationality may warrant further inquiry to ensure impartiality. See generally United States v. Douglas, 525 F.3d at 241 (noting that "this Court has not decided the issue of whether national origin is a cognizable classification for Batson protection" (internal quotation marks omitted)); cf. United States v. Stewart, 65 F.3d 918, 925 (11th Cir. 1995) (including "subject matter of case being tried" among "relevant

concern. As to prospective juror #26, the district court expressly found that she had "a more distracted attitude" than other members of the venire, which she manifested by persistently "looking over toward her left during the questioning." Voir Dire Tr. at 129. We defer to the district court's considerable voir dire experience in making demeanor observations, see Snyder v. Louisiana, 552 U.S. at 477, and we note that such distractedness is, by itself, a sufficient race-neutral ground to support exercise of a peremptory challenge, see generally Brown v. Kelly, 973 F.2d 116, 121 (2d Cir. 1992) ("An impression of the conduct and demeanor of the prospective juror during the voir dire may provide a legitimate basis for the exercise of a peremptory challenge.").

Accordingly, we identify no clear error in the district court's rejection of Sabir's Batson challenge with respect to prospective juror #26.

### 3. Prospective Juror #27

The prosecution offered two race-neutral reasons for excusing prospective juror #27: (1) the person's thirty-year career in the New York City Department of Social Services might cause him to be sympathetic to persons in difficult straits as well as more skeptical of government authority, and (2) his frequent television viewing of the three "CSI" television shows might make him reluctant to convict in the absence of scientific evidence. See Voir Dire Tr. at 131.

In Messiah v. Duncan, 435 F.3d 186 (2d Cir. 2006), we observed that "[i]t is not

circumstances" appropriate for consideration in evaluating Batson challenge).

implausible" for a prosecutor to think that "a social service provider who has dedicated his professional life to helping others might have more sympathy for a defendant" than other prospective jurors. Id. at 200. That conclusion, like many others informing peremptory challenges, may be based on a group stereotype, but not one that violates equal protection. Cf. J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 142 n.14 (1994) (distinguishing peremptory challenges based on race from those based on occupation).

Similarly, it was plausible for the prosecutor to think that a juror who regularly watched television shows in which forensic science conclusively solved crimes might be more inclined to demand such evidence in order to convict. See United States v. Fields, 483 F.3d 313, 355 n.39 (5th Cir. 2007) (observing that claim that "CSI" shows cause jurors to demand scientific evidence was "plausible" even though not "proven empirically").

The district court having found the prosecution credible in its profession of these concerns with respect to prospective juror #27, we identify no clear error in its rejection of Sabir's Batson argument with respect to the exercise of this peremptory challenge.

In sum, we reject Sabir's equal protection challenge to his conviction as without merit.

D.    Sabir's Evidentiary Challenges Are Uniformly Without Merit

Sabir asserts that his conviction is infected by a host of evidentiary errors pertaining to (1) the receipt of expert testimony, see Fed. R. Evid. 702; (2) the receipt of hearsay statements by Shah, see U.S. Const. amend. VI; Fed. R. Evid. 801(d)(2)(E); (3) the exclusion of a prior inconsistent statement by a prosecution witness, see Fed. R. Evid. 801(d)(1)(A); (4) the exclusion of evidence of defendant's state of mind, see Fed. R. Evid. 803(3); and (5)

55

the receipt of myriad evidence that was more prejudicial than probative, see Fed. R. Evid. 403.

### 1. Expert Witness Testimony

Sabir challenges the district court's decision, supported by a detailed written opinion, to allow Evan Kohlmann to testify as an expert witness about al Qaeda and Azzam Publications, the publisher of a jihadist videotape offered in the prosecution's direct case. See United States v. Sabir, No. 05 Cr. 673 (LAP), 2007 WL 1373184 (S.D.N.Y. May 10, 2007).

The admission of expert testimony is governed by Fed. R. Evid. 702, which states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The law assigns district courts a "gatekeeping" role in ensuring that expert testimony satisfies the requirements of Rule 702. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); see Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-94 (1993) (articulating non-exhaustive list of criteria court may apply in performing gatekeeping function). The inquiry is "a flexible one," Daubert v. Merrell Dow Pharms., Inc., 509 U.S. at 594, and district courts enjoy considerable discretion in deciding on the admissibility of expert testimony, see Kumho Tire Co. v. Carmichael, 526 U.S. at 152. We will not disturb a ruling respecting

expert testimony absent a showing of manifest error, see Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 213 (2d Cir. 2009), which is not present here.

a.      Kohlmann's Testimony Satisfied the Enumerated Requirements of Rule 702

Sabir contends that Kohlmann's testimony satisfied none of the three enumerated requirements of Rule 702.  We disagree.

Kohlmann's proposed expert testimony had a considerable factual basis:  (1) his graduate studies at Georgetown University's School of Foreign Service and Center for Contemporary Arab Studies and at the University of Pennsylvania Law School; (2) his full time employment at two organizations focusing on terrorism and al Qaeda, "Globalterroralert.com" and the Investigative Project; (3) his authorship of various academic papers and a book on al Qaeda; (4) his provision of consulting services on terrorism and al Qaeda to various federal agencies; and (5) his ongoing efforts to collect, analyze, and catalogue written, audio, and visual materials relevant to terrorism generally and al Qaeda in particular, including the records of guilty pleas and confessions from admitted al Qaeda operatives.

Before admitting Kohlmann's testimony, the district court also considered – without objection from the parties – the record of a Daubert hearing in another case in which Kohlmann was proffered as a terrorism expert.  The evidence adduced at that hearing permitted the trial judge to conclude that  Kohlmann's work had undergone "'various forms

57

of peer review,'" that his opinions were "'generally accepted within the relevant community,'" and that his methodology was "'similar to that employed by experts that have been permitted to testify in other federal cases involving terrorist organizations.'" United States v. Sabir, 2007 WL 1373184, at *8 (quoting United States v. Paracha, No. 03 Cr. 1197 (SHS), 2006 WL 12768, at *20 (S.D.N.Y. Jan. 3, 2006)).[32]

On this record, we conclude that the district court acted well within its discretion in concluding that Kohlmann's testimony satisfied the enumerated requirements of Rule 702.[33]

### b.       Kohlmann's Testimony Was Helpful to the Jury

Sabir submits that, even if Kohlmann properly qualified as an expert, his testimony about al Qaeda's history and structure was not helpful because jurors' familiarity with al Qaeda and its leader, Osama bin Laden, could be presumed. The argument requires little discussion. We have approved the use of expert testimony to provide juries with background on criminal organizations, notably organized crime families. See, e.g., United States v. Matera, 489 F.3d 115, 121-22 (2d Cir. 2007). As we explained in United States v. Amuso,

---

[32] Kohlmann has, in fact, been qualified as an expert on al Qaeda and terrorism in a number of federal prosecutions. See, e.g., United States v. Benkahla, 530 F.3d 300, 309 n.2 (4th Cir. 2008); United States v. Aref, 285 F. App'x 784, 792 (2d Cir. 2008); United States v. Abu-Jihaad, 600 F. Supp. 2d 362, 366 (D. Conn. 2009); United States v. Kassir, No. 04 Cr. 356 (JPK), 2009 WL 910767, at *7 (S.D.N.Y. Apr. 2, 2009).

[33] To the extent Sabir challenges Kohlmann's testimony about al Qaeda's terrorist activities in Saudi Arabia on the ground that the government offered no evidence of Sabir's specific awareness of these activities, the argument bears more on the comparative relevance/prejudice inquiry identified in Rule 403 than on the requirements stated in Rule 702. We discuss the relevancy of this part of Kohlmann's testimony infra at Part II.D.1.c.

58

21 F.3d 1251 (2d Cir. 1994):

> [d]espite the prevalence of organized crime stories in the news and popular
> media, these topics remain proper subjects for expert testimony. Aside from
> the probability that the depiction of organized crime in movies and television
> is misleading, the fact remains that the operational methods of organized crime
> families are still beyond the knowledge of the average citizen.

Id. at 1264. The rationale applies with equal force to terrorist organizations, including al

Qaeda.

c.      Kohlmann's Testimony Was Relevant

Sabir's relevancy challenge to certain aspects of Kohlmann's testimony is equally

unavailing. See Fed. R. Evid. 401, 403. To the extent Sabir submits that Kohlmann's

testimony about terrorist activities in Saudi Arabia – derived in part from Internet sources –

was too speculative to be probative, he misses the point of that testimony. The issue for jury

consideration was not whether the government could prove that al Qaeda was, in fact,

responsible, for particular terrorist acts in Saudi Arabia, but whether it could reasonably be

inferred that a person such as Sabir, who had lived in Saudi Arabia for a year, and who

proposed to support al Qaeda's efforts there by serving as the organization's on-call doctor,

would know that he was providing support to an organization that engaged in terrorism.

Kohlmann's testimony as to generally available information about al Qaeda's terrorist

activities in Saudi Arabia was more probative than prejudicial on this knowledge element of

§ 2339B. The prosecution's failure to adduce specific evidence of Sabir's familiarity with

the information went to the weight of Kohlmann's testimony rather than to its admissibility.

We similarly reject Sabir's relevance challenge to Kohlmann's testimony about al

Qaeda training camps. Such testimony was plainly relevant to mens rea as Sabir was charged both with conspiring with Shah to provide martial arts training to mujahideen and with agreeing to be on call to treat wounded mujahideen who sustained injuries either "in training" or in actual al Qaeda "operation[s]." GX 906T at 48.

### d. Kohlmann's Testimony Did Not Reach Beyond the Government's Rule 16 Proffer

Sabir faults the district court for allowing Kohlmann to testify beyond the scope of the government's proffer. See Fed. R. Crim. P. 16(a)(1)(G). The claim is patently meritless. The testimony about which Sabir complains, relating to "Islam, fatwa, and the 9/11 attacks," Appellant's Br. at 72, easily fell within the government's broad proffer, outlined in a February 23, 2007 letter, to present evidence about al Qaeda's "origins," "history," "structure," "leadership," "instructional methods," "operational logistics," and "acts of terrorism," United States v. Sabir, 2007 WL 1373184, at *2 & n.5 (quoting government proffer letter). Similarly meritless is Sabir's challenge to Kohlmann's expertise to discuss "Islam, fatwa, and the 9/11 attacks," to the limited extent of providing background on al Qaeda. Even if Kohlmann had testified beyond the government's Rule 16 proffer – which he did not – Sabir fails to show the "violation of a substantial right," the standard necessary to secure reversal for such an evidentiary error. United States v. Ebbers, 458 F.3d 110, 122 (2d Cir. 2006).

### 2. Co-Conspirator Statements

Sabir contends that the admission of tape recorded conversations between co-

defendant Shah and confidential informant Saeed or undercover Agent Soufan violated both

Fed. R. Evid. 801(d)(2)(E) and the Sixth Amendment's Confrontation Clause as construed

by the Supreme Court in Crawford v. Washington, 541 U.S. 36 (2004).[34]  Neither argument

is persuasive.

a.      Shah's Recorded Conversations with the Informant and the Undercover Were Admissible Under Fed. R. Evid. 801(d)(2)(E)

We review the district court's decision to admit Shah's recorded conversations as co-

conspirator statements under Fed. R. Evid. 801(d)(2)(E) only for clear error.  See United

States v. Al-Moayad, 545 F.3d 139, 173 (2d Cir. 2008).  In urging such error, Sabir submits

that the recordings were inadmissible because he did not participate in the conversations at

issue and was not mentioned in the course thereof.  The argument is flawed in two respects.

First, it misstates the facts.  Shah's recorded conversations with Saeed and Soufan repeatedly

referenced Sabir both by his first name "Rafiq," see, e.g., GX 801T at 1; GX 812T at 1, and

by his profession as a "doctor," see, e.g., GX 807T at 3; GX 902T at 23-24.  Second, and

more important, it misstates the standard for admissibility under Rule 801(d)(2)(E).

Rule 801(d)(2)(E) states that out-of-court declarations are not excludable as hearsay

if they are made "by a coconspirator of a party during the course and in furtherance of the

conspiracy."  To admit an out-of-court declaration under this rule, the district court must find

by a preponderance of the evidence "(a) that there was a conspiracy, (b) that its members

---

[34] While Sabir only references Shah's recorded conversations with the informant in mounting this challenge, we understand the argument also to reach Shah's recorded conversations with the undercover agent.

included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." United States v. Al-Moayad, 545 F.3d at 173 (internal quotation marks omitted); see also Bourjaily v. United States, 483 U.S. 171, 175-76 (1987). Where, as here, Shah and Sabir are the only alleged conspirators, the district court was required to find that Shah made the statements at issue in furtherance of a then-existing conspiracy between these two men.[35] Such a finding was amply supported by the recorded statements of both defendants. See Bourjaily v. United States, 483 U.S. at 175-76; United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996) (observing that hearsay statements may themselves be considered in determining admissibility under Rule 801(d)(2)(E), provided there is some independent corroboration of defendant's participation in conspiracy).

At the very start of his first recorded meeting with Saeed, on September 20, 2003, Shah identified "Rafiq" as his "partner," a term implying some agreement between the two men to pursue a common objective. GX 801T at 1 (explaining that "me and Rafiq are real tight" and "you always would see me with Rafiq"); see Trial Tr. at 600. Shah made plain

_____

[35] Where statements are made in the course of an existing conspiracy in which the defendant later joins, those statements may be admitted against him, even though he was not a member of the conspiracy at the time the statements were made, on the theory that he "assumes the risk for what has already happened" in the scheme. 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 801.34[4][a], at 801-84 (Joseph M. McLaughlin ed., 2d ed. 2007) ("Statements made before a conspiracy was actually formed fall outside the realm of Rule 801(d)(2)(E)."); see also United States v. Badalamenti, 794 F.2d 821, 828 (2d Cir. 1986) (holding that statements of co-conspirators were admissible against defendant under Rule 801(d)(2)(E), "even if made before he joined the conspiracy").

that the partnership extended to Shah's martial arts efforts, explaining that Sabir owned the building in Harlem where Shah operated his martial arts training center. See id. Thereafter, in recorded conversations with Saeed and Agent Soufan about joining al Qaeda, Shah repeatedly emphasized his partnership with Sabir and indicated that the two men would come to the terrorist organization as a "package . . . me and a doctor." GX 807T at 3-4; see GX 902T at 23 (stating "I come like with a pair, me and a doctor"). Shah explained that he knew Sabir's intentions and did not need to speak further with him to make this commitment, a statement suggestive of an existing agreement between the two men. See GX 902T at 23.

Moreover, on May 20, 2005, when Sabir met with Agent Soufan, he provided independent and explicit confirmation for what Shah had been saying to the informant and undercover agent: that Sabir and Shah had long discussed and agreed to support terrorists' pursuit of jihad.

> UC:       And, I'm, I will offer you that [the oath of allegiance to al Qaeda], brother, but it is up to you.
>
> SABIR:    So, you know this brother [Shah] here and I, I think, we have, I have to go with my brother because we have, we have talked about this for a long time, and because we have talked about it a long time, I feel it, uh, uh, not just that my spirit is with it, . . . but that if I didn't do it I will be abandoning my brother. And the very thing we agreed upon it in the first place. . . . [W]e are partners.

GX 906T at 110 (emphasis added).[36]

_____

[36] Elsewhere in the May 20, 2005 conversation, Sabir revealed how the men reached this agreement to support terrorism in the late 1990s. Sabir explained that he and Shah had originally planned to travel to Afghanistan to assist the mujahideen. See GX 906T at 17

This record plainly supports the district court's finding that, as of the time of the first recorded conversation at issue in 2003, Shah and Sabir had already reached a tacit understanding to use their respective professional expertise to support jihad, and that Shah's statements before the May 20, 2005 meeting, like Sabir's statements at that meeting, were made in furtherance of that agreement.

Sabir submits further that Shah's recorded statements were inadmissible under Rule 801(d)(2)(E) because they were not made in furtherance of the conspiracy, but instead were "idle chatter." United States v. Paone, 782 F.2d 386, 390 (2d Cir. 1986). We are not persuaded. Shah was plainly seeking to persuade someone whom he thought could admit him to al Qaeda that he and Sabir were trustworthy and would, in fact, provide material assistance to that organization. That Shah's statements were sometimes vague and rambling does not alter the fact that, in their entirety, they were made in furtherance of an agreement with Sabir to provide material support for terrorism. In any event, Sabir does not show that any possible digressions from the conspiratorial purpose in Shah's statements were prejudicial. See United States v. Mercado, 573 F.3d 138, 141 (2d Cir. 2009).

          b.     The Admission of Shah's Statements Did Not Violate Sabir's

---

("That was an aspiration, that was a hope, a dream that we had to go move to the mountains."). This statement comported with Shah's earlier remark to Agent Soufan that, as early as 1998, the two men had "really wanted to get over to Afghanistan," where they wanted to "be right in it." GX 902T at 5. Sabir explained that he "never . . . made . . . any definite move" with respect to Afghanistan because he "did not see a clear way" to provide assistance. GX 906T at 17-18. Sabir stated that it was in the late 1990s, when the men were experiencing problems at a Bronx mosque, that they recognized the advantage of "people working within their expertise" in aid of jihad. Id. at 65.

<u>Right to Confrontation</u>

Sabir's reliance on <u>Crawford v. Washington</u>, 541 U.S. 36, to mount a Confrontation Clause challenge to the receipt of Shah's statements is foreclosed by <u>United States v. Saget</u>, 377 F.3d 223 (2d Cir. 2004), in which this court held that "a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of <u>Crawford</u>," <u>id.</u> at 229.  As then-Judge Sotomayor explained in writing for the <u>Saget</u> panel, <u>Crawford</u> instructs that the critical factor in identifying a Confrontation Clause concern is "the declarant's awareness or expectation that his or her statements may later be used at a trial."  <u>Id.</u> at 228.  Here, there is no question that in his conversations with Saeed and Soufan, Shah was unaware that he was speaking to agents for the government or that his statements might later be used at a trial.  Because Shah's recorded statements are thus not testimonial in nature, this case is on all fours with <u>Saget</u>, and Sabir's Confrontation Clause challenge fails.  <u>See also</u> <u>United States v. Logan</u>, 419 F.3d 172, 178 (2d Cir. 2005) ("In general, statements of co-conspirators in furtherance of a conspiracy are non-testimonial.").

        3.      <u>Prior Inconsistent Statement</u>

Prosecution witness Tony Richardson testified that while participating in Shah's martial arts classes in Maryland, he met a doctor introduced to him as "Dr. Sabir or Sabir Rafiq or Rafiq Sabir" with whom he spoke briefly.  Trial Tr. at 230-31.[37]  Asked on cross-

---

[37] Richardson made no in-court identification of Sabir as the person to whom he was introduced.

65

examination if he was positive as to the name, Richardson answered "No, not positive. I don't even remember his name totally. It was Dr. Sabir Rafiq or Rafiq Sabir, something to that effect." Id. at 232. Defense counsel then sought to impeach Richardson by reading aloud from grand jury testimony in which Richardson ascribed the name Rafiq Sabir or Sabir Rafiq to a friend in Texas.

> Q.    [Do you know] Rafiq Sabir?
>
> A.    Do not – Sabir Rafiq.
>
> Q.    Rafiq Sabir. Do you know a Sabir Rafiq?
>
> A.    My friend in Texas, which I don't think he knows Mahmud at all. I think his middle name is Rafiq Sabir, Sabir Rafiq, I'm not sure.

Id. at 235. The district court overruled the prosecution's objection to this line of questioning, but did not permit Sabir to offer the grand jury testimony into evidence as a prior inconsistent statement under Fed. R. Evid. 801(d)(1)(A). Sabir submits that the latter ruling was erroneous. We identify no abuse of discretion, much less violation of a substantial right, in the district court's decision. See United States v. Bah, 574 F.3d 106, 116 (2d Cir. 2009); United States v. Mercado, 573 F.3d at 141.

Rule 801(d)(1) of the Federal Rules of Evidence states that an out-of-court statement is not hearsay if "[t]he declarant testifies at the trial . . . and is subject to cross-examination concerning the statement, and the statement is . . . inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury . . . ." Richardson's grand jury testimony indicating that he had a friend in Texas whose "middle name is Rafiq Sabir [or]

66

Sabir Rafiq," was not, strictly speaking, inconsistent with his trial testimony that the doctor whom he briefly met at Shah's martial arts class was named "Dr. Sabir or Sabir Rafiq or Rafiq Sabir." As the district court correctly observed, if Richardson had given a negative answer at trial to a question about knowing anyone else named Sabir beside this doctor, then the grand jury testimony might have presented an inconsistency. But no such question was ever asked.

In any event, Sabir can hardly demonstrate that he was prejudiced by the district court ruling. The grand jury testimony was not relevant for its truth, i.e., whether Richardson in fact had a friend in Texas, part of whose name was Rafiq Sabir or Sabir Rafiq. Rather, it was relevant for the fact that, when asked if he recognized the name Rafiq Sabir, Richardson did not mention any doctor whom he met with Shah, but only a friend in Texas. This fact was adequately placed before the jury by Richardson's acknowledgment of the grand jury statement. It did not require actual admission of the grand jury record.

### 4. State-of-Mind Evidence

Sabir submits that the district court erred in refusing to admit statements he made to federal authorities on October 5, 2004, when entering the United States from Saudi Arabia. According to a contemporaneous FBI report, see Appellee's Br. Add. 1-3, these statements recounted Sabir's personal, educational, and employment background; the circumstances prompting his move from the United States to Saudi Arabia; his personal and professional activities in Saudi Arabia; his financial support for various causes; his appreciation for life in the United States compared to Saudi Arabia; and his intent to return to live in the United

67

States at some unspecified future time and to "make things better" in this country. In one statement, Sabir professed not to condone suicide bombing. Sabir submits that these statements were admissible because they evidenced a state of mind not disposed to provide material support to al Qaeda.

We note that both before the district court and on appeal Sabir presented this argument in a conclusory fashion. The one-paragraph argument in his appellate brief does not cite – much less discuss – the relevant rule, see Fed. R. Evid. 803(3), or our precedents construing its scope, see, e.g., United States v. Cardascia, 951 F.2d 474 (2d Cir. 1991); United States v. DiMaria, 727 F.2d 265 (2d Cir. 1984) (Friendly, J.). No matter. Even if Sabir could demonstrate that his October 5, 2004 statements were admissible under Rule 803(3), a point we need not here decide, we would not grant him a new trial because any error was plainly harmless.

Sabir testified at length about his views regarding the United States, al Qaeda, and its methods. See, e.g., Trial Tr. at 1491 (testimony of Sabir that "[s]uicide is wrong in all circumstances in Islam"). Further, he was permitted to introduce into evidence a document he wrote in February 2005, which described his vision for an "Islamic Justice Organization" dedicated to "ensur[ing] justice for Muslims" by lawful means. See id. at 1554, 1558. The government's contrary evidence of Sabir's intent to commit the charged crimes, however, was clearly overwhelming. The tape recorded meeting of May 20, 2005, supra at **[5-6, 21, 27-31]**, reveals Sabir swearing loyalty to support the terrorist organization by providing medical treatment for its wounded combatants in Saudi Arabia. On this record, we easily

68

conclude that the exclusion of Sabir's October 5, 2004 statements was harmless. See United States v. Song, 436 F.3d 137, 140 (2d Cir. 2006) (deeming harmless erroneous exclusion of state of mind evidence where defendant "was permitted to testify in sufficient detail as to his theory of the case" and government presented overwhelming evidence of guilt); United States v. Lawal, 736 F.2d 5, 9 (2d Cir. 1984) (same).

### 5. Rule 403 Objections

Sabir submits that the district court erred in admitting evidence that was more prejudicial than probative, specifically: (a) certain materials seized from Shah pertaining to Mohammad Shareef, a radical Muslim cleric; (b) testimonial evidence regarding a 2000 incident in which certain individuals – not including Shah or Sabir – attempted to take control of a Poughkeepsie mosque by force; and (c) testimony about mujahideen activities in Bosnia. We are not persuaded.

### a. The Shareef Materials

Because Sabir raised no objection to the Shareef materials at trial, we review the admission of that material only for plain error. See United States v. Yousef, 327 F.3d at 121. The point requires little discussion because Sabir's conclusory challenge fails to demonstrate error in the admission of evidence indicating that Shah held radical views on Islam. As Shah would manifest in his various recorded statements, such views fueled the formation of the charged conspiratorial agreement to provide material support for jihad. Further, Sabir does not even attempt to show how the admission of such evidence – in a case in which the conspirators are recorded swearing allegiance to al Qaeda – affected his substantial rights or

69

undermined "'the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Payne, 591 F.3d 46, 66 (2d Cir. 2010) (quoting United States v. Olano, 507 U.S. 725, 732 (1993)).

### b. The Poughkeepsie Mosque Incident

We review the remaining two rulings for abuse of discretion, see United States v. Bah, 574 F.3d at 116; United States v. Mercado, 573 F.3d at 141, and detect none here.

Sabir submits that the district court committed Rule 403 error in permitting prosecution witness Anwar Kearney, imam of a mosque in Poughkeepsie, to testify that in 2000, a group of persons who followed the teachings of Mohammad Shareef attempted to take over the mosque by force of arms. Although Shah, who taught martial arts at the mosque, associated with this group, he did not participate in the armed takeover attempt. Nor did Sabir, who occasionally visited Shah in Poughkeepsie at about this time.

The district court concluded that the evidence was nevertheless probative of the evolution of Shah's state of mind in embracing jihad. We cannot identify abuse of discretion in this conclusion. Shah's evolution as a militant supporter of jihad was relevant in the trial of Sabir because the two men were close, longstanding "partners," purportedly so familiar with each other's minds that one could speak for the other in supporting jihad. GX 906T at 110. Indeed, at the May 20, 2005 meeting at which the partners swore allegiance to al Qaeda, Sabir acknowledged that he and Shah had been discussing jihad for a long time and referenced past experiences that informed their agreement to support jihad by working within their respective areas of expertise. See id. at 65, 110.

70

### c. *Mujahideen* Activities in Bosnia

Sabir submits that testimony from Yahya Muhammad, a longtime friend of Shah, about the support he provided to mujahideen in Bosnia was more prejudicial than probative. In fact, the evidence was relevant to understanding why, in about 2003, Sabir would ask Muhammad for advice about traveling abroad to provide medical assistance to mujahideen. See Trial Tr. at 286-87. Such evidence, in turn, tended to demonstrate that when Sabir subsequently offered to serve as an on-call doctor for al Qaeda combatants in Saudi Arabia, he was acting with the knowledge necessary to support the counts of conviction.

### E. Summation Issues

Sabir contends that the district court erred by (1) precluding him from arguing in summation that the government had targeted him for prosecution based on his religion, while allowing the government to make a contrary argument; and (2) permitting the government to vouch for its witnesses. In support of the first argument, Sabir points us to the following excerpt from the summations.

> [DEFENSE COUNSEL]: Dr. Sabir is an important piece on the chess board. He's an important piece to the FBI investigation, and he's an important piece to Shah. Everybody wants Dr. Sabir.
>
> [THE GOVERNMENT]: Objection.
>
> THE COURT: Sustained.
>
> [DEFENSE COUNSEL]: . . . . [T]here's a very interesting discourse that occurred between myself and [Agent] Soufan while he was testifying about whether or not there was an increase in investigation by the FBI of the Muslim community post 9/11. Well, common sense, when you talk about common sense, you all know that there was, and to sit here and try to tell you that there

71

wasn't just belies what the agenda is.

[THE GOVERNMENT]: Objection.

THE COURT: Sustained. Ladies and gentlemen, the decision of the government to investigate an individual or the decision of a grand jury to indict an individual is none of your concern. The only concern this jury has is whether or not the government has or has not proved each element[] of the crimes charged beyond a reasonable doubt.

Trial Tr. at 2417-18.

A sidebar conference ensued, at which the district court cautioned defense counsel to refrain from arguing selective prosecution to the jury, advising that such a defense should be raised with the court in a post-trial motion.[38] Defense counsel initially complied with this instruction, but then more subtly returned to the selective prosecution theme in attacking the FBI for "decid[ing] which way the case [against Sabir] was going" based on an internal perception of what was "correct" without regard to whether "reality" demonstrated otherwise. Id. at 2431.

The government responded with the following rebuttal argument:

Then, there was the argument that the government is out looking for sinners. The government picked and chose Dr. Rafiq Sabir as some sort of trophy blaming the government for its efforts [in] fighting terrorism; and this from a defendant who said, I support all anti-terrorism efforts, that is, except for if it involves the use of undercovers, except if it involves people infiltrating the

---

[38] No selective prosecution motion was ever filed in this case. In an extended colloquy prior to the defense summation, the district court had already cautioned counsel about the impropriety of arguments insinuating that Sabir had been improperly targeted for prosecution, particularly in light of the fact that investigating agents had no knowledge of Sabir until he was introduced into the case by co-defendant Shah, and given that the defense had withdrawn any claim of entrapment.

72

mujahideen.

. . .

Well, the government, as the Judge told you, is not on trial. It's not a game of shifting blame to the government and blaming agents for what they do, their jobs, putting their lives on the line and finding terrorism wherever it is.

You heard the testimony of both the agents in this case; former Agent Ali Soufan, and Special Agent Brian Murphy. Both served this country with distinction. Both told you that they followed the investigation where it went. Where it went and where it ended up was May 20, 2005. With the defendant taking bayat to bin Laden.

Id. at 2487-88.

Following rebuttal, Sabir unsuccessfully moved for a mistrial, arguing that the government had improperly raised the issue of selective prosecution and vouched for its own witnesses. Reviewing the district court's decision for abuse of discretion, see United States v. Smith, 426 F.3d 567, 571 (2d Cir. 2005), we identify none.

First, we identify no error in the district court's challenged rulings with respect to the defense summation. As we have explained, a selective prosecution defense alleges "a defect in the institution of the prosecution," and as such "is an issue for the court rather than the jury." United States v. Regan, 103 F.3d 1072, 1082 (2d Cir. 1997) (internal quotation marks omitted); see also Fed. R. Crim. P. 12(b)(3)(A).

Second, we identify no error in the government's rebuttal. The law has long recognized that summations – and particularly rebuttal summations – are not "detached exposition[s]," United States v. Wexler, 79 F.2d 526, 530 (2d Cir. 1935), with every word "carefully constructed . . . before the event," Donally v. DeChristoforo, 416 U.S. 637, 646-47 (1974). Precisely because such arguments frequently require "improvisation," courts will

73

"not lightly infer" that every remark is intended to carry "its most dangerous meaning." Id. To be sure, the prosecution may not "appeal to . . . passion" in urging a guilty verdict, United States v. Wilner, 523 F.2d 68, 74 (2d Cir. 1975), but it may be passionate in arguing that the evidence supports conviction, see United States v. Wexler, 79 F.2d at 530 (recognizing that summations are "inevitably charged with emotion"). As a consequence, a defendant who seeks to overturn his conviction based on alleged prosecutorial misconduct in summation bears a "heavy burden." United States v. Feliciano, 223 F.3d 102, 123 (2d Cir. 2000) (internal quotation marks omitted). He must show more than that a particular summation comment was improper. See generally United States v. Newton, 369 F.3d 659, 680 (2d Cir. 2004) (observing that "prosecutors' comments standing alone" will rarely warrant overturning conviction (internal quotation marks omitted)); United States v. Rodriguez, 968 F.2d 130, 142 (2d Cir. 1992) (noting that "it is a 'rare case'" in which improper summation comments by prosecution will be so prejudicial as to warrant new trial (quoting Floyd v. Meachum, 907 F.2d 347, 348 (2d Cir. 1990)). He must show that the comment, when "viewed against the entire argument to the jury," United States v. Bermudez, 529 F.3d 158, 165 (2d Cir. 2008) (internal quotation marks omitted), and "in the context of the entire trial," was so severe and significant as to have "substantially prejudiced" him, depriving him of a fair trial, United States v. Newton, 369 F.3d at 680; see United States v. Locascio, 6 F.3d 924, 945 (2d Cir. 1993). That is not this case.

In his own summation, defense counsel repeatedly ignored court warnings and insinuated to the jury that Sabir was the victim of selective prosecution. While it was the

court's role, not the prosecution's, to instruct the jury that this question was not before them, the government hardly deprived Sabir of a fair trial by briefly alluding to these improper arguments in reminding them of the judge's instruction. See generally United States v. Tocco, 135 F.3d 116, 130 (2d Cir. 1998) ("[W]here the defense summation makes arguments and allegations against the government, the prosecutor may respond to them in rebuttal."); United States v. Rivera, 971 F.2d 876, 883 (2d Cir. 1992) (noting that defense argument may "'open the door' to otherwise inadmissible prosecution rebuttal"); United States v. Marrale, 695 F.2d 658, 667 (2d Cir. 1982) (noting that "prosecutor is ordinarily entitled to respond to the evidence, issues, and hypotheses propounded by the defense").

Similarly, we identify no error in the prosecution's response to the defense attack on its agents' credibility and competency. See United States v. Perez, 144 F.3d 204, 210 (2d Cir. 1998) (recognizing prosecutors' "greater leeway" in commenting on own witnesses' credibility after defense attack). While prosecutors may not strike "foul" blows they may strike "hard" ones, Berger v. United States, 295 U.S. 78, 88 (1935), and the challenged arguments stayed on the permissible side of this line, cf. United States v. Young, 470 U.S. 1, 18 (1985) (holding that prosecutor may not imply that extrinsic evidence not before jury supports witness's credibility); United States v. Drummond, 481 F.2d 62, 64 (2d Cir. 1973) (holding that prosecutor may not make issue of "own credibility" (internal quotation marks omitted)); accord United States v. Rivera, 971 F.2d at 884. While routine credibility attacks do not generally call for references to the life-threatening nature of law enforcement work, where, as in this case, the defense referenced the danger inherent in dealing with co-

75

defendant Shah to question the undercover agent's credibility or competency in certain respects, the government's brief allusion to agents "putting their lives on the line" was within the bounds of fair response.

F.      Juror Misconduct

In the course of jury deliberations, the district court learned that Juror #8, using the electronic search engine "Google," had discovered that co-defendant Tarik Shah had pleaded guilty to unspecified charges and then communicated that fact to other jurors. Sabir submits that the district court erred in failing to grant his pre-verdict motion for a mistrial or his post-verdict motion for a new trial, see Fed. R. Crim. P. 33, based on this juror misconduct. We are not persuaded.

We review for abuse of discretion the district court's handling of alleged juror misconduct, see United States v. Vitale, 459 F.3d 190, 197 (2d Cir. 2006); its denial of a mistrial, see United States v. Smith, 426 F.3d 567, 571 (2d Cir. 2005); and its denial of a Rule 33 motion for a new trial, see United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009). In doing so, we accord the district court "broad flexibility," mindful that addressing juror misconduct always presents "a delicate and complex task," United States v. Cox, 324 F.3d 77, 86 (2d Cir. 2003) (internal quotation marks omitted), particularly when the misconduct arises during deliberations, see United States v. Thomas, 116 F.3d 606, 618 (2d Cir. 1997). Further, we recognize that the district court is "in the best position to sense the atmosphere of the courtroom as no appellate court can on a printed record." United States v. Abrams, 137 F.3d 704, 708 (2d Cir. 1998) (internal quotation marks omitted).

76

While the law presumes prejudice from a jury's exposure to extra-record evidence, see Remmer v. United States, 347 U.S. 227, 229 (1954); United States v. Greer, 285 F.3d 158, 173 (2d Cir. 2002), that presumption may be rebutted by a "showing that the extra-record information was harmless," Bibbins v. Dalsheim, 21 F.3d 13, 16 (2d Cir. 1994); see United States v. Schwarz, 283 F.3d 76, 99 (2d Cir. 2002) ("[N]ot every instance of a juror's exposure to extrinsic information results in the denial of a defendant's right to a fair trial. Many such instances do not."). The necessary inquiry is "objective," Bibbins v. Dalsheim, 21 F.3d at 17 (internal quotation marks omitted), and focuses on two factors: (1) the nature of the information or contact at issue, and (2) its probable effect on a hypothetical average jury, see United States v. Schwarz, 283 F.3d at 99.

The effect inquiry properly considers the "entire record" in making an objective assessment of possible prejudice. United States v. Weiss, 752 F.2d 777, 783 (2d Cir. 1985). This includes circumstances surrounding the jurors' exposure to the information. See United States v. Greer, 285 F.3d at 173. But a court may not reach further to inquire into the subjective effect of the information on jurors' mental processes or on the jury's deliberations. This limitation, memorialized in Fed. R. Evid. 606(b), is grounded in the deeply rooted view that "the secrecy of deliberations is essential to the proper functioning of juries." United States v. Thomas, 116 F.3d at 618-19 (collecting authorities). In any event, a district court must be careful that it does not itself "create prejudice by exaggerating the importance and impact" of extra-record information. United States v. Abrams, 137 F.3d at 708.

With these principles in mind, we conclude that the district court acted well within its

77

discretion in denying Sabir's mistrial and new trial motions. The district court reasonably considered the "nature" of the extrinsic evidence – an Internet report of Shah's guilty plea – in light of Sabir's summation concession that Shah was, in fact, guilty: "[I]f this was a case about Tarik Shah, I wouldn't even have got up. Tarik Shah is guilty." Trial Tr. at 2406. The district court concluded that, in these circumstances, Sabir was unlikely to be harmed by extrinsic information entirely consistent with his own concession.

In urging otherwise, Sabir submits that the defense summation did not indicate the actual outcome of Shah's case; was not itself "evidence" of the crime; and, in contrast to the extra-record information, was not hearsay. The second and third points warrant little discussion, as the district court's assessment of the nature of the information was not based on its admissibility. Nor did the district court fault defense counsel's summation or excuse the juror misconduct. As for the first point, Sabir notes a difference without a distinction for purposes of identifying prejudice. Whatever harm might have ensued from the jury's discovery of Shah's guilty plea in a case where Sabir's defense did not concede his co-defendant's guilt, where, as here, such a concession was made, the jury's discovery that a guilty co-defendant had, in fact, pleaded guilty, was unlikely to deprive Sabir of a fair trial.

That conclusion is only reinforced by the district court's questioning of the jurors. When Juror #8 was asked if anything would prevent her from being fair and impartial in judging Sabir's case, she replied that there was not. Asked if she would be able to follow the court's instruction to judge the case solely on the basis of the trial evidence, Juror #8 answered, "Definitely." Id. at 2694. We have recognized that, in appropriate circumstances,

78

confirmation of a juror's ability to follow cautionary instructions can indicate the lack of

harm from misconduct. See United States v. Thai, 29 F.3d 785, 803 (2d Cir. 1994); accord

United States v. Abrams, 137 F.3d at 708.

Sabir suggests that the district court erred in reaching this conclusion without further

asking Juror #8 whether she had "Googled" Sabir himself.  We disagree.  Such a leading

question might itself have "create[d] prejudice" by implying that a broader search could yield

further information about Sabir.  See United States v. Abrams, 137 F.3d at 708.  The district

court acted well within its discretion in instead asking Juror #8 more generally whether she

had uncovered any information beyond the fact of Shah's guilty plea and, upon receiving a

negative response, making no further inquiry particular to Sabir.

We further conclude that the district court did not abuse its discretion in declining to

question the remaining jurors individually.  Addressing the jury as a whole, the district court

instead repeated certain instructions potentially implicated by Juror #8's actions.  These

specifically included the following:

> It is your function in this case to decide the issues of fact.  Your decision on
> the issues of fact is to be based solely on the evidence.  Nothing I say is
> evidence.  Nothing any of the lawyers say is evidence.  Questions by
> themselves are not evidence. Objections are not evidence. Testimony that has
> been excluded or which you're told to disregard is not evidence.  The evidence
> consists of the sworn testimony of the witnesses and the exhibits that have
> been received into evidence for your consideration.  Also, in some instances
> there were facts the lawyers agreed to or facts that I instructed you to find.
>
> . . .  You may not draw any inference, favorable or unfavorable, toward the
> government or the defendant from the fact that any person in addition to the
> defendant is not on trial here.  You also may not speculate as to the reasons
> why other persons are not on trial.  Those matters are wholly outside your

concern and have no bearing on your function as jurors.

. . .

Now, ladies and gentlemen, is there any juror who is unable or unwilling to follow those instructions?  Anyone?

Trial Tr. at 2698-2700.  Because no juror indicated that he or she would have a problem following these instructions, see United States v. Thai, 29 F.3d at 803, the district court reasonably concluded from the totality of the circumstances that the misconduct at issue did not warrant either a mistrial or new trial, see United States v. Greer, 285 F.3d at 173; United States v. Abrams, 137 F.3d at 708.

## III.    Conclusion

To summarize, we conclude that:

1.    Title 18 U.S.C. § 2339B is not overbroad or otherwise unconstitutionally vague as applied to Sabir's case.

2.    The trial evidence was sufficient to support Sabir's conviction for conspiring and attempting to provide material support to a known terrorist organization.

3.    The jury selection in Sabir's case did not violate the Equal Protection Clause as construed in Batson v. Kentucky, 476 U.S. 79.

4.    With respect to Sabir's various evidentiary challenges:

a.    the district court did not abuse its discretion in admitting expert testimony pertaining to al Qaeda pursuant to Fed. R. Evid. 702;

b.    the admission of recorded conversations between co-defendant Shah and either an informant or undercover agent was supported by Fed. R. Evid. 801(d)(2)(E) and did not

80

violate Sabir's constitutional right to confrontation;

        c.       the district court acted within its discretion in allowing cross-examination about a witness's prior statements in the grand jury but in refusing to admit the grand jury transcript as evidence of a prior inconsistent statement pursuant to Fed. R. Evid. 801(d)(1)(A);

        d.       we need not decide whether the district court erred in holding that evidence of Sabir's professed state of mind on October 5, 2004, was inadmissible under Fed. R. Evid. 803(3) because any error would, in any event, be harmless in this case; and

        e.       there is no merit to Sabir's claims that various evidence should have been excluded under Fed. R. Evid. 403 as more prejudicial than probative.

5.      The district court's summation rulings did not deprive Sabir of a fair trial.

6.      The district court acted well within its discretion in denying Sabir's motions for a mistrial and new trial because the record plainly supports its finding that Sabir was not prejudiced by juror exposure to extrinsic Internet information about co-defendant Shah.

        The judgment of conviction is AFFIRMED.

REENA RAGGI, *Circuit Judge,* concurring in part:

With respect to Part II.D.4 of the court's opinion, I certainly agree with the conclusion that if there was any error in the district court's failure to admit Sabir's October 5, 2004 statements to federal authorities when entering the United States from Saudi Arabia, such error was harmless beyond a reasonable doubt. See ante at **[68-69]**. I would go further, however, and conclude that there was no error because Sabir's October 5, 2004 statements did not, in fact, satisfy the requirements of Federal R. Evid. 803(3). To explain this conclusion, it is necessary to discuss those requirements in some detail.

Rule 803(3) recognizes a hearsay exception for

[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

All hearsay exceptions are rooted in one or more conditions thought to ensure sufficient reliability to permit a factfinder to forego the law's preferred means for testing evidence: cross-examination. In the case of Rule 803(3), that condition is "contemporaneity," i.e., the statement must evidence the declarant's "then existing state of mind," a circumstance presumed to reduce a declarant's chance for reflection and, therefore, misrepresentation. See United States v. Cardascia, 951 F.2d 474, 487-88 (2d Cir. 1991); see also 2 McCormick on Evidence § 274, at 267 (Kenneth S. Broun ed., 6th ed. 2006) ("[T]he special assurance of reliability for statements of present state of mind rests upon their spontaneity and resulting probable sincerity. The guarantee of reliability is assured principally by the requirement that

1

the statements must relate to a condition of mind or emotion existing at the time of the statement." (footnote omitted)).

Contemporaneity, of course, is not a foolproof safeguard of reliability. As commentators have observed, "few things are easier than to misrepresent one's thoughts." 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8:70, at 596 (3d ed. 2007) (observing that "state-of-mind exception offers less assurance against deception than some others that also require immediacy"). This has prompted a number of courts to condition Rule 803(3) admissibility on the presence of "no suspicious circumstances suggesting a motive for the declarant to fabricate or misrepresent his or her thoughts." 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 803.05[2][a], at 803-31 & n.4 (Joseph M. McLaughlin ed., 2d ed. 2007) (collecting cases); see 4 Mueller & Kirkpatrick, supra, § 8:71, at 613-14 & n.30 (collecting cases); see also 6 John H. Wigmore, Evidence in Trials at Common Law § 1732, at 160 (James H. Chadbourn ed., rev. ed. 1976) (providing for statement of then existing state of mind to be excluded if "circumstances indicate plainly a motive to deceive"). This court, however, is not among them.

In United States v. DiMaria, 727 F.2d 265 (2d Cir. 1984) (Friendly, J.), we observed that the Federal Rules of Evidence create hearsay exceptions by "categories," id. at 272. We thus concluded that if a statement fits an identified category, no further "finding of probable credibility by the judge" is generally required to apply the hearsay exception. Id. (recognizing that credibility of statement may be considered in connection with business record and residual hearsay exceptions). Thus, the self-serving nature of a statement

2

expressing a state of mind does not automatically preclude application of Rule 803(3). That concern is properly considered by the jury in deciding what weight to accord the statement. See id. at 271; accord United States v. Cardascia, 951 F.2d at 487.

Although this court does not superimpose any credibility condition on Rule 803(3), we have in no way relaxed the rule's stated requirement for assuring reliability: contemporaneity. Nor have we absolved statements satisfying Rule 803(3) from the relevancy requirements of Fed. R. Evid. 401 and 403. See generally 2 McCormick on Evidence, supra, § 274, at 267-69 n.8 (observing that contemporaneity requirement of Rule 803(3) works together with relevance rules in determining admissibility of statement).

United States v. DiMaria presented no contemporaneity or relevance concerns. The defendant's spontaneous utterance to approaching FBI agents – "I only came here to get some cigarettes real cheap" – easily satisfied Rule 803(3)'s contemporaneity requirement in that it purported to reveal the declarant's then existing state of mind with respect to the very conduct in which he was engaged. 272 F.2d at 270-71. Such a statement was relevant because defendant's mens rea at the precise moment of his utterance was an element of the charged crime. See id. at 271. Further, we assigned a high probative value to the statement because the government was relying on a presumption to carry its mens rea burden. See id. at 272 (observing that admission of statement was particularly warranted because "the Government is relying on the presumption of guilty knowledge arising from a defendant's possession of the fruits of a crime recently after its commission").

DiMaria, however, had no occasion to consider contemporaneity and relevance in the

3

circumstances presented here: a statement of state of mind made on one occasion offered as evidence of state of mind on another occasion. The proffered statement may express the declarant's state of mind at the time made, but that does not make it relevant to mens rea at a different time. The law nevertheless recognizes the possibility that an expression of state of mind on one occasion may be relevant to state of mind at a later time where the statement reflects "a continuous mental process." United States v. Cardascia, 951 F.2d at 488. Such continuity effectively extends the "contemporaneity" of the statement beyond the moment of pronouncement. Cf. id. (recognizing possibility of continuity extending contemporaneity required by Rule 803(3) but not finding principle applicable to statement offered to support backward inference[1]). For example, experience and common sense indicate that someone who professes to be a baseball fan on Monday is likely to be of the same state of mind on Tuesday. Statements of intent also may reflect a continuing mental process. See 2 McCormick on Evidence, supra, § 274, at 270 (observing that assertion of then-existing intent to go on business trip next day "will be evidence not only of the intention at the time of the statement, but also of the same purpose the next day when the declarant is on the road").

Not all statements describing a declarant's mental state, however, warrant an inference

---

[1] Backward looking inferences generally run afoul of Rule 803(3)'s express exclusion of "statement[s] of memory or belief to prove the fact remembered or believed." See also 4 Mueller & Kirkpatrick, supra, § 8:71, at 603-06 (discussing issues associated with drawing forward and backward inferences as to mens rea from statement made at time distinct from that at which conduct at issue occurred).

4

of continuity. Some expressions of emotion last a lifetime, while others may be unlikely to persist long after their triggering events. Some professions of state of mind may be too vague or tenuous to support an inference of continuity, particularly where there is a significant lapse of time between the declaration and the mens rea at issue. Intervening events may also signal a possible change in the declarant's state of mind. This court has thus held that "[w]hether a statement is part of a continuous mental process and therefore admissible under the present state of mind exception" is "a question for the trial court." United States v. Cardascia, 951 F.2d at 488. As with any determination of fact, we will not disturb a trial court's finding as to likely continuity in the absence of clear error. Cf. United States v. Monteleone, 257 F.3d 210, 221 (2d Cir. 2001) (applying clear error review to factual findings underlying trial court's decision to admit statement under Fed. R. Evid. 801(d)(2)(E)); United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999) (same).

Precisely because a finding of continuity effectively extends the contemporaneity of a statement beyond common understanding – and, therefore, expands the application of Rule 803(3) – the question merits careful judicial attention. Commentators have appropriately suggested that district courts should consider "all the factors on both sides of the equation" in determining the likely continuity of a proffered statement of state of mind, including "the possibility of bad faith" by the declarant. 5 Weinstein & Berger, supra, § 803.05[2][c][i], at 803-36. This is not contrary to DiMaria, which precludes judicial inquiry into the credibility of the expressed state of mind when contemporaneity is not at issue. But where contemporaneity is in question, depending on whether a state of mind expressed on one

5

occasion is likely to have continued through to another time relevant to the case, a district court's consideration of the totality of the circumstances properly includes any indications as to whether the proffered statement was made in good or bad faith. Other factors that may also inform the inquiry include, but are not limited to, what the statement itself actually says about the declarant's state of mind and how clearly, the lapse of time between the statement and the conduct for which mens rea is at issue in the case, and any intervening life events or statements by the declarant signaling a possible break in mental process or change of mind. See generally 4 Mueller & Kirkpatrick, supra, § 8:71, at 604.

With these principles in mind, I identify no error in the exclusion of Sabir's October 5, 2004 statements. As the district court correctly recognized, the vast majority of those statements recounted "things that happened in the past," Trial Tr. at 1343, i.e., "fact[s] remembered," Fed. R. Evid. 803(3), and, thus, fall outside the rule's exception. As for the few statements purporting to express Sabir's then existing state of mind – i.e., his professed appreciation for life in the United States compared to Saudi Arabia, his stated intent to return to live in the United States and to "make things better" in this country, and his observation that he did not condone suicide bombing – I note that Sabir's state of mind on October 5, 2004, the date of declaration, was not really at issue in the case. To be sure, that date fell within the time frame of the charged conspiracy. But conspirators, like other persons, do not pursue their objectives at all times. Certainly, the government did not contend that any of Sabir's actions on October 5, 2004, were in furtherance of the conspiracy. Much less did it rely on those actions in attempting to prove a mens rea element of the crime. Rather, it

6

focused on Sabir's words and actions at the May 20, 2005 meeting with the undercover agent to prove a mens rea intent on supporting terrorism. To the extent Sabir offered his October 5, 2004 statements as evidence of a state of mind not disposed to support al Qaeda, the requirements of contemporaneity and relevance required the district court to decide whether Sabir likely maintained that state of mind through that date.

This conclusion is not at odds with our holding today on Sabir's Rule 801(d)(2)(E) challenge because a trial court's focus in deciding what evidence to admit is different from a jury's focus in deciding the question of guilt. While the trial court was required to find the existence of a conspiracy throughout the period 2003-05 to admit Shah's recorded statements against Sabir under Rule 802(d)(2)(E), it was required to make that finding only by a preponderance. Meanwhile, the jury could not convict Sabir of conspiracy except upon proof beyond a reasonable doubt, but it could make that finding with respect to any time within the charged period. See United States v. Heimann, 705 F.2d 622, 666 (2d Cir. 1983) (upholding conviction where conspiracy proved some time within charged period). Thus, where, as in this case, all parties focused on May 20, 2005, as the critical date for determining Sabir's participation in the charged conspiracy and related attempt offense, the trial judge could appropriately consider whether Sabir's earlier professed state of mind likely continued to that date in deciding whether the statement was admissible under Rules 401, 403, and 803(3).

The record not only fails to support such a finding of continuity; it compels a contrary conclusion. As the district court observed, Sabir's October 5, 2004 statements were vague and self-serving, raising legitimate concerns about the likelihood of his maintaining the state

7

of mind they purportedly described into the next year.[2] **[T 1118]** Quite apart from these concerns, however, the record provides conclusive proof that Sabir's purported state of mind on October 5, 2004, was <u>not</u> his state of mind on May 20, 2005. That proof is, of course, the tape recording of the May 20 meeting. Far from indicating that Sabir was not inclined to support al Qaeda, the recording showed him swearing fealty to this terrorist organization and promising to support it by serving as an on-call doctor for its wounded combatants in Saudi Arabia. On this record, I think it would be impossible to find that the October 5, 2004 statements expressed a then-existing state of mind that continued through May 20, 2005. In the absence of such continuity, the October 5, 2004 statements failed to satisfy both the contemporaneity requirement of Rule 803(3) and the relevancy requirements of Rules 401 and 403. For these reasons, I think the district court properly excluded the statements from evidence, and I would reject Sabir's Rule 803(3) challenge as without merit.

---

[2] The district court alluded to the self-serving nature of Sabir's October 5, 2004 statements not only in refusing to admit those statements under Rule 803(3), but also in rejecting Sabir's argument that the statements were admissible under Rule 801(d)(1)(B) to rebut a charge of recent fabrication in his trial testimony. **[T 1630-35]** <u>See</u> <u>United States v. Al-Moayad</u>, 545 F.3d at 167 (explaining that "Rule 801(d)(1)(B) . . . includes a fundamental temporal requirement: 'The statement must have been made before the declarant developed [an] alleged motive to fabricate.'" (quoting <u>United States v. Forrester</u>, 60 F.3d 52, 64 (2d Cir. 1995))). I note that Sabir does not challenge the district court's 801(d)(1) ruling on appeal.

Dearie, Chief District Judge, dissenting in part.

I write to voice my strong disagreement with the majority's conclusion that the evidence is legally sufficient to sustain the attempt conviction. I otherwise concur.

This is not an attempt. I agree that application of the familiar "substantial step" formula must be made on a case-by-case basis and that in some cases the adequacy of the proof may not be readily determined, but this is not such a case. I agree that the distinction between various forms of material support may prove meaningful in some cases, but again this is not such a case. Whatever the label, the substantive crime was so remote in time, place and objective that one is left only to speculate as to what, if anything, would have happened had Sabir in fact been in a position to pursue the conspiratorial goal.

Without the benefit of meaningful input from the litigants or trial court, moreover, the majority appears to expand the reach of "personnel"[1] to include those who do nothing beyond "pledge[] to work under the direction of the

---

[1] Title 18 U.S.C. § 2339B(h) disallows prosecution "in connection with the term 'personnel' unless [a] person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control." As we reaffirm in response to Sabir's challenge, this "limiting definition . . . answers [any] vagueness concerns," rendering the provision constitutional. Humanitarian Law Project v. Holder, 130 S. Ct. 2705, 2721 (2010).

organization." Majority Op., ante at **[47]**. This conclusion is without precedent and hinges upon what is, in my view, a seriously flawed interpretation of the material support statutes.

## I.

There is no question that, construed in the government's favor, the evidence supports the conspiracy count. A rational jury could have found that, at the single meeting with his co-conspirator and the undercover agent, Sabir indeed agreed to provide medical support to wounded al Qaeda somewhere in Saudi Arabia at some point in the future. Fairly stated, the majority further concludes that once Sabir offered these services, he took a substantial step toward becoming the organization's "on call" doctor. The remaining evidence to support the attempt conviction is Sabir's swearing an oath to al Qaeda, which the government acknowledges is not a criminal act, and his providing contact numbers, which the decisions of this Circuit confirm is not a substantial step toward the commission of a crime.

The majority is correct that a "substantial-step analysis necessarily begins with a proper understanding of the crime being attempted." Majority Op., ante at **[36]**. Count Two of the indictment charged Sabir with attempting to provide

"material support" to al Qaeda in the form of "personnel, training, and expert advice and assistance, as those terms are defined" in 18 U.S.C. §§ 2339A-B, "to wit . . . attempt[ing] to provide medical support to wounded jihadists." (4th Superseding Indictment, 05 cr 673, Dkt. #89, at 3-4.) The majority, however, does not affirm on the ground that Sabir's actions were an attempt to provide actual medical support to wounded jihadists in Saudi Arabia. Nor could it, in light of this Circuit's established precedent, discussed below. Rather, the majority focuses elsewhere, concluding that "[w]hether or not Sabir's May 20, 2005 actions were a substantial step in the provision of expert medical services to terrorists," Sabir's actions on this date "were a substantial step in the provision of Sabir himself as personnel." Majority Op., ante at **[43]** (emphasis supplied).

The rule is clear enough "that we may affirm on any grounds for which there is a record sufficient to permit conclusions of law." Chesley v. Union Carbide Corp., 927 F.2d 60, 68 (2d Cir. 1991) (internal quotation marks omitted). There is no dispute that the evidence is sufficient to establish the element of intent, leaving only the import of Sabir's conduct to be determined. The majority concludes that a reasonable juror could find, based on the evidence, that Sabir took a substantial step toward providing himself as personnel. Going further, the majority suggests that Sabir's conduct would have sufficed to provide himself as personnel had

-3-

circumstances been as he believed, a novel question that the litigants never expressly considered, much less briefed.[2]  I address these matters in turn.

## II.

The issue before us is whether Sabir's meeting with an undercover agent in the Bronx, "swearing an oath of allegiance to al Qaeda" and "providing . . . contact numbers for al Qaeda members to reach him in Saudi Arabia" constitute a substantial step toward his providing personnel (i.e., himself) to work under al Qaeda's direction and control.  Majority Op., ante at **[40]**.  Although "substantial step" analysis is often "fraught with difficulty," United States v. Ivic, 700 F.2d 51, 66 (2d Cir. 1983), in this case, the question is straightforward and readily answered in the negative.

I find no case, in any court, that even remotely supports the majority's conclusion that a defendant attempts a crime simply by agreeing to commit the

---

[2] During and after trial, the government advanced the view that the attempt count in this case regards actual medical support. See Gov't Summation, 5/15/07 Trial Tr., 05 cr 673, at 2373-74 ("How did Rafiq Sabir try to provide material support?  In this case, his expert advice and assistance in the form of his medical skills."); Gov't Sentencing Mem., 05 cr 673, Dkt. #174, at 3 ("Sabir took a substantial step toward providing expert advice and assistance – i.e., his medical skills – to al Qaeda.").  In defending the conviction on appeal, the government speaks of "material support" generally.  Gov't Br. at 58.  At oral argument, however, the government confirmed that Sabir attempted to provide "medical services," then offered to perform additional research to present its "best case" that Sabir might have been found guilty of attempting to provide personnel.

crime and providing a phone number. Nor does the government, in its single-paragraph ipse dixit defense of the conviction, offer any authority to support its position. The majority opinion cites established precedents that recite the recognized law of attempt, but none of these cases, regardless of outcome, justifies the majority's position. Quite the contrary.

First, the cases routinely hold that mere preparation is not an attempt. See, e.g., United States v. Manley, 632 F.2d 978, 987 (2d Cir. 1980) ("A substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime."). As the majority notes, a substantial step must be part of "'a course of conduct planned to culminate in [the] commission of the crime.'" Ivic, 700 F.2d at 66 (quoting Model Penal Code § 5.01(1)(c)). It is the conduct that is dispositive. Here, however, there was little to none. There was just talk that was, for the most part, prompted by the undercover agent. There is no evidence of any activity whatsoever that might indicate that Sabir had indeed embarked upon a determined path to proximate criminality in providing material support.

Second, in the cases in which this Circuit has sustained a finding of attempt, "'the accused's conduct ha[d] progressed sufficiently to minimize the risk of an

unfair conviction.'" Manley, 632 F.2d at 988 ("'[A]n attempt is necessarily predictive . . . .'") (quoting United States v. Busic, 549 F.2d 252, 257 n.9 (2d Cir. 1977)). For example, in United States v. Stallworth, 543 F.2d 1038, 1041 (2d Cir. 1976), the case in which we adopted the substantial step formulation of the Model Penal Code, we found evidence of a substantial step toward robbery because the defendants cased the target bank, discussed their plan of attack, armed themselves, stole ski masks and surgical gloves, and actually moved toward the bank to commit the crime. We held that "[a]ll that stood between appellants and success was a group of F.B.I. agents and police officers" whose timely intervention "probably prevented not only a robbery but possible bloodshed." Id. at 1041. Likewise, in Manley, 632 F.2d at 988, we held that the defendant took a substantial step toward purchasing drugs because he drove to an acquaintance's home late at night with a large amount of cash that was roughly equivalent to the value of the cocaine found at the house. In affirming that conviction, we aptly observed that "it is hard to conceive of any additional preliminary steps which [the defendant] could have taken short of the actual acquisition of the narcotics." Id. at 989. And in United States v. Crowley, 318 F.3d 401, 408 (2d Cir. 2003), we found sufficient evidence of an attempt to commit a sexual act by force after the defendant pinned his victim to the bed, put his hand in her shorts and sought to penetrate her with his fingers.

By comparison, the meager evidence of any action by Sabir to further the criminal objective falls far short of a substantial step.

The majority also relies on <u>Ivic</u>, 700 F.2d at 67, a case that explores the outer boundaries of what actions constitute a substantial step. In that case, having already acquired explosives and devised a plan of attack, one defendant authorized the bombing of a travel agency and the other reconnoitered the site. Judge Friendly found that the evidence of attempt was "sufficient, although <u>barely so</u>." <u>Id</u>. (emphasis supplied). If casing the location and stockpiling explosives is "barely" an attempt, how can Sabir's limited conduct possibly be?

The principal case the majority invokes, <u>United States v. Delvecchio</u>, 816 F.2d 859, 861-62 (2d Cir. 1987), compels the conclusion that no attempt occurred here. The majority correctly cites this decision as "hold[ing] that evidence of a verbal agreement alone, without more, is insufficient as a matter of law to support an attempt conviction," <u>id.</u> at 862, but finds that "by promising to be on call in Saudi Arabia to treat wounded al Qaeda members[] and by providing private and work contact numbers," Majority Op., <u>ante</u> at **[40]**, Sabir engaged in a substantial step sufficient to sustain a conviction for attempting to provide himself as

personnel. Closer attention to Delvecchio's facts illuminates the flaw in the majority's reasoning.

In Delvecchio, we found the evidence of an attempt to purchase drugs insufficient even though Delvecchio and his partner had sought out suppliers, actually an undercover agent and an informant, then agreed to buy five kilograms of heroin from them at 10:00 pm the following evening for $195,000 per kilogram on a specific street corner in Manhattan. At one of two dinner meetings, the Delvecchio defendants, like Sabir, gave their contact numbers to the agent and informant. Id. at 861. Without hesitation, however, we concluded that the defendants had not attempted to purchase the narcotics, because their "plan to possess heroin had only advanced to the stage of meeting with their purported suppliers to work out the terms of the deal." Id. at 862 ("[E]vidence of a verbal agreement alone, without more, is insufficient as a matter of law to support an attempt conviction."). The government failed to show that the defendants "performed any overt act to carry out the agreed upon" transaction; the defendants had not, for example, "set out for the meeting site" or "attempted to acquire the almost one million dollars necessary to complete the purchase." Id. We upheld the defendants' conspiracy convictions alone.

It cannot seriously be disputed that the <u>Delvecchio</u> defendants' actions, like those of the defendants in every case mentioned above, were far closer to an attempt at the respective crime than were Sabir's. The <u>Delvecchio</u> defendants worked out every aspect of an imminent drug deal. Sabir, by contrast, viewing the facts in the government's favor, agreed to be "on call" as a doctor halfway around the world under unspecified conditions at some indefinite time in the future. Sabir never had the chance to demonstrate whether his actions would have been consistent with his conspiratorial pledge. Indeed, Sabir and the undercover did not even "work out the terms of the deal." <u>Id.</u> at 862.

Before Sabir could have placed himself under al Qaeda's direction or control, moreover, he needed to return to Riyadh. He "[a]ssum[ed] that" he could "get back," which required locating or replacing his passport and enlisting the aid of the consulate. GX906T at 14. In addition to these administrative hurdles, Sabir had to overcome restrictions on his mobility and find a place in which to treat wounded <u>mujahideen</u>. Sabir told the undercover that he was being forced to live on hospital grounds, <u>id.</u> at 66-70, agreed that he could not treat wounded jihadists at the hospital, <u>id.</u>, doubted his ability to leave the confines of his hospital "without people watching [his] every movement," <u>id.</u> at 70-71, and volunteered that he had

no means of transportation, id. at 16.[3]  The Delvecchio defendants, in stark

contrast, completed all such preliminary arrangements, but even then the panel

readily concluded that no attempt had occurred.  816 F.2d at 862.

The majority purports to distinguish Delvecchio in a number of ways.

Initially, the majority notes that "[w]hereas an attempt to possess focuses on a

defendant's efforts to acquire, an attempt to provide focuses on his efforts to

supply, a distinction that necessarily informs" the attempt analysis.  Majority Op.,

ante at **[37]**.  This distinction is not meaningful.  To demonstrate, suppose that the

Delvecchio defendants' convictions were based upon an agreed-upon supply of

drugs to an undercover agent, rather than an acquisition from the agent.  In such a

case, would a verbal agreement plus a contact number equal an attempt?  We held

otherwise in United States v. Rosa, 11 F.3d 315, 339-40 (2d Cir. 1993).  Because

the Rosa defendant "did not produce any heroin for the proposed sale," nor had he

"made any effort to obtain heroin . . . in order to sell it to" the agent, we once again

held the evidence insufficient to sustain an attempt conviction.  Id. at 340-41.  Rosa

illustrates that, whether acquiring or providing, a defendant who follows an

---

[3] Although Sabir told the undercover that he could "leave the job" if "living on the hospital property is big enough of a problem," GX906T at 69, the undercover mentioned Sabir's "very helpful" hospital ID, to which Sabir responded:  "I guess that it means that if they are forcing me to live in the hospital property, then I might just have to submit to that and to try to, uh, find another way."  Id. at 67-69.

agreement with inactivity while the criminal objective remains beyond reach cannot be guilty of an attempt. See Rosa, 11 F.3d at 340 (emphasizing the defendant's statement that his own supplier "might be in jail"). In either case, the pivotal issue is proximity – in time, place or readiness – to commission of the charged offense.

To support its conclusion, the majority poses the hypothetical situation in which we are to assume that Sabir is not a doctor but rather an al Qaeda recruiter who recruits doctors like Sabir. The majority is correct that, under those circumstances, the recruiter could be found guilty of attempting to provide personnel. Such conduct, which could be accomplished locally, would be real, measurable and meaningful. See Stallworth, 543 F.2d at 1040 n.5 (noting that "'soliciting an innocent agent to engage in conduct constituting an element of the crime'" may be a substantial step sufficient to uphold an attempt conviction) (quoting Model Penal Code 5.01(2)(g)). Simply stated, the recruiter in the hypothetical has done something. He has provided a service to the organization. His culpability is not a matter of conjecture. Cf. United States v. Awan, 384 F. App'x 9, 13 (2d Cir. 2010) (affirming conviction for conspiracy to provide personnel where testimony and recorded conversations "provided sufficient evidence from which a rational jury could find that [the defendant] was recruiting

-11-

for" a foreign terrorist organization).  By attending a meeting and volunteering his services, the actual Sabir, unlike the hypothetical recruiter, has done nothing more than reiterate agreement.[4]

Finally, and most importantly, the majority proposes that Sabir went beyond attending a meeting and agreeing to serve:  he "took a step essential to provide al Qaeda with personnel in the form of an on-call doctor" by "provid[ing] the means by which <u>mujahideen</u> in Riyadh could reach that doctor at any time."  Majority Op., <u>ante</u> at **[42]**.  This observation might have some significance if Sabir's "enlistment" came at or near some jihadist camp or battleground, and he was situated, equipped and ready to assist; but the location in question was almost 7,000 miles away, and no preparations to be "on call" had been made or even discussed,[5] leaving the actual provision of material support entirely a matter of speculation and surmise.  If, to borrow the majority's phrase, "a step essential" to sustain an attempt conviction were provision of a contact number for resultant

---

[4] The majority's conclusion that these actions comprise a substantial step, thus distinguishing this case from <u>Delvecchio</u> and <u>Rosa</u>, begs the analysis, since those opinions focus on the respective defendants' actions (or lack thereof) <u>after</u> their initial agreements with the undercover agents. Sabir did not, for instance, call multiple subsequent meetings, describe his criminal plan in the utmost detail, settle most but not "all of the specifics" and "continue[] to negotiate with the government agent[]until his arrest prevented him from doing so." <u>United States v. Jonsson</u>, 15 F.3d 759, 762 (8th Cir. 1994) (finding such actions sufficient to distinguish <u>Delvecchio</u>).

[5] The undercover agent initially requested Sabir's phone number in case "there is anything <u>you</u> [<u>i.e.</u>, Sabir] need over there." GX906T at 40 (emphasis supplied).

-12-

transactions, then Delvecchio must have been wrongly decided. Drawing all conceivable inferences in favor of the government, there is simply no way to square these facts with the cases cited and conclude that an attempt has been established.

**III.**

Just as troubling as the majority's "substantial step" analysis is its suggestion that a person actually completes the crime of providing "material support in the form of personnel as soon as he pledges to work under the direction of the organization."[6] Majority Op., ante at **[47]**. In so suggesting, the majority enters largely untested statutory waters.

The few courts to rule on sufficiency challenges relating to the term "personnel" – or even to construe the term – have required a level of engagement, activity or compliance far surpassing Sabir's someday, someplace commitment

---

[6] In footnote **[19]** to the majority opinion, Judge Raggi expresses her own view that had the undercover agent instead been an al Qaeda operative, the evidence might well support a finding that Sabir actually provided himself as personnel, and not merely attempted to do so. Although the majority states that it does not reach that question, the suggestion that Sabir's actions might have completed the crime likewise appears in connection with the majority's definition of "reserve personnel." Majority Op., ante at **[46-47]**. The identity of the meeting's third participant, however, has no bearing on the attempt analysis. Had a bona fide high-level recruiter been at that meeting, the breadth of the provable conspiracy would have widened; but without a substantial step, as courts until now have construed the requirement, no attempt would have occurred.

here.[7]  Compare United States v. Abu-Jihaad, 600 F. Supp. 2d 362, 401 (D. Conn.

2009) (communicating sensitive defense information to terrorist organization on

single occasion was insufficient evidence of providing self as "personnel," without

evidence that the organization requested such information pursuant to a prior

"arrangement[]" and that the defendant "did as requested"), aff'd on other grounds,

— F.3d —, 2010 WL 5140864 (2d Cir. Dec. 20, 2010); United States v. Warsame,

537 F. Supp. 2d 1005, 1018 (D. Minn. 2008) (contacting overseas al Qaeda

associates while in North America, without more, "would be inadmissible as

evidence of guilt [absent] additional conduct that would constitute provision of

'personnel'") with United States v. Taleb-Jedi, 566 F. Supp. 2d 157 (E.D.N.Y.

2008) (teaching language classes, translating documents and working in

---

[7] The statutory provision at issue, enacted in 2004, prohibits a person from providing (or attempting to provide) "himself" as personnel to a terrorist organization, and adds the requirement that personnel must work under the organization's "direction or control."  18 U.S.C. § 2339B(h).  "Statutory definitions control the meaning of statutory words, of course, in the usual case."  Lawson v. Suwannee Fruit & S.S. Co., 336 U.S. 198, 201 (1949) (authorizing deviations from the general rule in the "unusual case" or where a term is defined with less than "'watch-like precision'").  Personnel is ordinarily defined as the "body of people employed in an organization, or engaged in a service or undertaking, esp. of a military nature" (Oxford English Dictionary Online, http://www.oed.com/view/Entry/141512?redirectedFrom=personnel#), or the "body of persons employed by or active in an organization, business, or service" (American Heritage Dictionary of the English Language 1311 (4th ed. 2000)).  I offer these definitions not, as the majority suggests, to override the statute, but to inform the question of what in fact suffices to provide oneself as personnel, a "blank to be filled."  Burgess v. United States, 553 U.S. 124, 130-32 (2008) (evaluating a statutorily defined term in "context" and in light of how the term "is commonly defined").  The language in § 2339B(h), moreover, is not a traditional definition, which appear in § 2339B(g) (defining "classified information," "financial institution," "training," "expert advice and assistance" and other terms).  Rather, § 2339B(h) bars prosecution unless certain requirements are met; nothing suggests that these preconditions are conclusive of liability.  See Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 n.14 (1985) (holding that where a statutory "definition" contains requirements for liability rather than simply defining the term, "[t]he implication is that while [such] acts are necessary, they may not be sufficient").

organization's political division at Iraqi base potentially equaled providing self as "personnel"); United States v. Lindh, 212 F. Supp. 2d 541, 580 (E.D. Va. 2002) (training with and fighting alongside terrorist groups in Afghanistan potentially equaled providing self as "personnel"); United States v. Goba, 220 F. Supp. 2d 182, 193-94 (W.D.N.Y. 2002) (attending al Qaeda training camp for five weeks potentially equaled providing selves as "personnel"); cf. United States v. Stewart, 590 F.3d 93, 115 (2d Cir. 2009) (relaying repeated messages to and from imprisoned terrorist regarding ongoing conspiracy was "'active participation'" that equaled providing prisoner as "personnel"); Awan, 384 F. App'x at 17 (soliciting another "for training and carrying out attacks in India on behalf of" terrorist organization equaled conspiring to provide recruit as "personnel"); United States v. Marzook, 383 F. Supp. 2d 1056, 1065 (N.D. Ill. 2005) (recruiting another "to join Hamas and make trips to the Middle East" to scout attack locations potentially equaled providing recruit as "personnel").

These courts consistently distinguish between activity and passivity, in each case criminalizing the former and not the latter. The majority states that "it may frequently be the case that a defendant who intends to provide a terrorist organization with personnel also intends for the personnel to provide the organization with services." Majority Op., ante at **[42]**. That, I submit, is an

understatement. To suggest that Sabir became al Qaeda's doctor in Riyadh after the May 2005 meeting in the Bronx, thus facilitating more dangerous missions, requires logical leaps that the record below simply will not bear. [8] To serve the statute's objectives without overreaching, some post-agreement activity must be shown to establish an attempt to provide oneself as personnel.

Further, by transforming offers to provide services into attempted provision of personnel, the majority's holding may sanction multiple punishments for a single offense. [9] An attempt requires a substantial step toward criminality; a conspiracy requires agreement with another wrongdoer. On these facts, however, the majority substitutes evidence of agreement and intent for evidence of the substantive crime. See, e.g., United States v. Gore, 154 F.3d 34, 46 (2d Cir. 1998)

---

[8] The majority cites to Congress's finding, made in connection with § 2339B's adoption, that "[f]oreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Humanitarian Law, 130 S. Ct. at 2724 (quoting AEDPA § 301(a)(7), 110 Stat. 1214, 1247 (1996)). This finding is "best read to reflect a determination that any form of material support" to a terrorist organization, including "ostensibly peaceful aid," should be barred. Id. at 2724-25 (rejecting the argument that contributions which advance "only the legitimate activities of the designated terrorist organizations" are permissible). As such, I join in the unanimous holding that § 2339B, by its terms, criminalizes the practice of medicine (or the doctor himself) that Sabir agreed to provide to al Qaeda. The record below, however, does not support the conclusion that Sabir is guilty of attempting or committing the substantive offense.

[9] Although Sabir did not raise a double jeopardy challenge, nor could he have raised one, to an apparent conclusion of law announced for the first time on appeal, multiple sentences for the same offense are cognizable as plain error. See United States v. Coiro, 922 F.2d 1008, 1013-15 (2d Cir. 1991). Sabir's attorney did unsuccessfully argue below for concurrent sentences, moreover, since the conspiracy and substantive charges "are actually encompassed in the same conduct." (11/28/07 Sentencing Tr., 05 cr 673, at 13-14.)

-16-

(disallowing multiple sentences for violations of a single statute where, given the "narrow set of facts" presented, "no longer does each offense require proof of a fact that the other does not"). As the majority concludes, at the May 2005 meeting, Sabir "formalize[d] his promise" to work for al Qaeda. Majority Op., ante at **[41]**. Thus, it is hard to see how the conspiracy and attempt convictions meaningfully differ. See Iannelli v. United States, 420 U.S. 770, 785-86 & n.18 (1975) (reaffirming that "the real problem" in such cases "is the avoidance of dual punishment").

Conspiracy charges unaccompanied by a completed substantive crime are relatively rare, and can be troubling when the available evidence leaves one to speculate whether the criminal objective would have been realized. In this case, such concern is compounded by the need to find the line between radical beliefs and radical action.[10] The law of attempt has evolved to take the guesswork out of finding that line. At the one meeting Sabir attended, he indeed chanted the mantra of the terrorist, led by the government agent and inspired by his co-defendant. But

---

[10] In the context of 18 U.S.C. § 2339A, this Court has noted that "[b]y applying . . . the prohibition against providing 'personnel' . . . to a circumstance in which the defendants provided themselves, the government created a situation in which the defendants could be punished for, in effect, providing themselves to speak out in support of the program or principles of a foreign terrorist organization, an activity protected by the First Amendment." Stewart, 590 F.3d at 118 (contrasting this situation with that of providing another as personnel, an activity that "does not carry the same risk with its corresponding constitutional implications"). While giving full import to § 2339B(h)'s limiting definition, to which the Stewart panel cited, I submit that punishing do-nothing "personnel" for violating the statute's substantive provisions "in effect" punishes such actors for aligning with a terrorist organization.

we are left to wonder whether his apparent enthusiasm would have, or even could have, led to action on his part. That should not be, and no imaginable view of the evidence removes this uncertainty.

This Court observed in Crowley that "[t]he problem faced by the drafters [of the Model Penal Code] was that to punish as an attempt every act done to further a criminal purpose, no matter how remote from accomplishing harm, risks punishing individuals for their thoughts alone, before they have committed any act that is dangerous or harmful." 318 F.3d at 408. I submit that the majority has done just that by abandoning the notion, fundamental to attempt jurisprudence, that we punish criminal deeds and not thoughts or intentions. The majority declares, however, that the crime at issue "is of a quite different sort." Majority Op., ante at [37]. Whatever the "sort" of offense, Sabir was not charged with mere membership in al Qaeda or for being sympathetic to some radical Islamic cause. Signing on to the al Qaeda roster of loyalists (as reprehensible as that may be) is not, and could not be, the crime at issue, since "Section 2339B does not criminalize mere membership in a designated foreign terrorist organization. It instead prohibits providing 'material support' to such a group." Humanitarian Law, 130 S. Ct. at 2718; see also id. at 2730 ("[T]he statute does not penalize mere association with a foreign terrorist organization."); 18 U.S.C. § 2339B(i) ("Nothing in this

section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States.").

The majority asserts that "a reasonable jury could have concluded that," based on his May 20, 2005 actions, "Sabir crossed the line from simply professing radical beliefs or joining a radical organization to attempting [the] crime" of providing himself to work under al Qaeda's control. Majority Op., <u>ante</u> at **[42]**. The only evidence tending to show such control is the oath. But the litigants, and presumably the majority, agree that the oath alone is not a basis for imprisonment.[11] At best, the oath reflects an agreement and intention to follow directions, but "mere intention to commit a specified crime does not amount to an attempt." <u>Manley</u>, 632 F.2d at 988 (internal quotation marks omitted). Despite the majority's apparent preoccupation with Sabir's state of mind, the independent evidence of attempt in this case remains a pair of phone numbers. Those evidentiary morsels cannot sustain the substantive conviction.

As recent history tragically illustrates, provision of <u>material</u> support of any form to a terrorist organization emboldens that organization and increases the

---

[11] In the government's own words: "[T]he bayat pledge, the pledge itself, by Rafiq Sabir was not in and of itself a crime. . . . The bayat itself is not the crime, but it is compelling powerful evidence of those crimes. It shows exactly what Rafiq Sabir was thinking. It shows his sincere commitment to aid al Qaeda." 5/15/07 Trial Tr., 05 cr 673, at 2337.

likelihood of future terrorist attacks.  That is why Congress enacted statutes criminalizing such activity.  Simply stated, however, the majority has at once unwisely re-written the law of attempt, raised freedom-of-association concerns and possibly treaded on double jeopardy protection, "opening the door to mischievous abuse."  United States v. Johnpoll, 739 F.2d 702, 715 (2d Cir. 1984).  Regardless of Sabir's inclination, as a matter of law, any step he took toward that end was insubstantial and any support he furnished unquestionably immaterial.

In the end, a man stands guilty, and severely punished, for an offense that he did not commit.  Therefore, I respectfully dissent.